## JUMEL and DESOBRY *against* THE MARINE INSURANCE COMPANY.

A vessel was insured from *New-York* to *Bordeaux,* and at and from *Bordeaux* to *New-York.*

THIS was an action on a policy of insurance, dated the 10th *October,* 1807, on the brig *Stephen, Barker,* The vessel, on her return voyage, was captured the 24th of *January,* 1808, and carried into *England,* and on the 1st of *June,* 1808, the insured abandoned. The correspondents of the insured, at the request of the master, put in a claim for the assured, as owners of the vessel and cargo; and the vessel, on the 29th of *March,* 1808, was condemned, and the cargo restored. They entered an appeal from the sentence as to the vessel; and the captors appealed from the sentence as to the cargo. By compromise both appeals were withdrawn, and the master, on the 3d of *June,* 1808, purchased the vessel of the captors for 1,300 pounds, with all her original papers, and sailed for *New-York,* where he arrived in safety and delivered the cargo. To raise money to pay for the vessel, and to defray the expenses arising from the capture, the master gave a *bottomry* bond to the correspondents of the insured, in *London.*

It was held, that the insured were entitled to abandon for a total loss, and their rights having become fixed by the act of abandonment, on the 1st of *June,* 1808, they were not bound by the subsequent acts of the master, but were entitled to recover for a total loss, and also for all the expenses incurred in endeavouring to recover the property, prior to the composition between the master and captors, which expenses were to be apportioned, as general average, and borne by the vessel, freight and cargo; but the insured on the vessel could only recover the proportion chargeable to the vessel.

The rule that the insured may recover, in the first instance, of the insurers on the vessel, the whole general average, does not apply to the case where the ship, freight and cargo belong to the same person, and the freight and cargo are not insured.

The insurers having refused to accept the ship and affirm the purchase made by the master, they were held not to be answerable for the *marine* interest secured to be paid by the *bottomry* bond, nor for any rges or loss consequent to the purchase; but only for a total loss and expenses of labourin or the recovery of the vessel, &c. prior to the composition with the captors.

master, on a voyage from *New-York* to *Bordeaux*, and at and from *Bordeaux* back to *New-York;* warranted *American* property, proof whereof, if required, to be made here only ; and warranted by the assured not to abandon, in case of capture or detention, until six months after advice thereof received at the office of the defendants, unless previously condemned.

A verdict was taken, by consent, at the *New-York* sittings, the 14th *April*, 1810, subject to the opinion of the court, on the following case. The vessel sailed from *Bordeaux*, on her return voyage, with a cargo of brandy and dry goods, on the 24th *December*, 1807, but was detained in the river by an embargo, until the 24th *January*, 1808. On the same day she was captured by a *British* privateer and carried into *Plymouth*, and both vessel and cargo were libelled in the admiralty court. A claim was interposed in behalf of the plaintiffs, who were owners of the vessel and cargo, by Messrs. *Batard, Sampson & Sharp*, the correspondents of the plaintiffs, to whom the master addressed himself, and at his request. On the 29th *March*, 1808, the vessel was condemned, and the cargo restored. The claimants appealed from the sentence condemning the vessel, and the captors appealed from the sentence restoring the cargo. An abandonment was made by the plaintiffs on the 1st *June*, 1808, which was renewed the 23d of *August*, 1808. An arrangement was made between the captors and the master, by which it was agreed, that the master should relinquish the appeal entered as to the vessel, and the captors should relinquish the appeal as to the cargo ; and both appeals were accordingly withdrawn, on the 21st of *April*, 1808, and an entry made in the minutes of the admiralty to that effect, and a writ of unlivery or restitution of the cargo was sued out. This arrangement was made by the advice of counsel, who gave a decided opinion that the sentence of condemnation would be affirmed, and probably with costs.

ALBANY,
Feb. 1811.

JUMEL and
DESOBRY
v
MAR. INS Co.

With the approbation of *Batard, Sampson & Sharp,* the master, afterwards, purchased the vessel of the captors. They demanded 1,500 pounds, but they finally agreed to take 1,300 pounds, and deliver the vessel, with all her original papers, as she was before capture. The purchase was concluded on the 3d of *June,* 1808, and a bill of sale executed; and on the 14th *June,* 1808, the king's license was obtained, ratifying the purchase, and permitting the vessel to sail with her original papers. To pay the purchase-money, and defray the other expenses arising from the capture, the captain took up money on *bottomry* interest, and executed a *bottomry* bond to *Batard, Sampson & Sharp,* who advanced the money; the bond, amounting to 13,634 dollars and 84 cents, was paid by the plaintiffs, after the arrival of the vessel at *New-York.* *Batard, Sampson & Sharp* wrote to the plaintiffs, on the 1st of *June,* 1808, informing them what had been done; and that it was necessary for the master to take up money on *bottomry,* to pay the purchase-money of the vessel and the other expenses, and enclosing their account of the sums advanced by them, for which they had taken the bond. In their letter, *Batard, Sampson &* *Sharp* mention, that the price paid for the vessel was, perhaps, higher than she would have sold for at public sale; but it was thought, that it would be more agreeable to the plaintiffs, to avoid the inconvenience and expense of landing the cargo, and sending it by another vessel. The vessel arrived in safety at *New-York,* and delivered her cargo. The plaintiffs, afterwards, on the 23d of *August,* 1808, addressed a letter to the defendants, informing them of the arrival of the vessel, and the delivery of the cargo, and repeating their abandonment. They also stated, that the captain had been obliged to give a bottomry bond, and if the defendants meant to consider the purchase as made for their benefit, they must pay the bond, after deducting the freight, or if they disavowed the purchase, the master, paying the bond,

would be at liberty to dispose of her; that if the defendants returned no answer, the plaintiffs would be obliged to sell the vessel at auction, and after paying the bond and charges, to hold the surplus for the benefit of whom it might concern. To this letter the defendants, on the 29th *August*, 1808, answered that they were not able to say whether they did or did not accept the abandonment, but they propose to pay the bond, deducting the freight, and that the vessel remain or be sold for the benefit of whom it may concern. The plaintiffs, in their reply, dated the 13th *September*, 1800, say they "accede to the proposals," and are ready to receive the amount of the bond, deducting the freight, leaving a balance of 11,412 dollars and 43 cents, and enclose the bond, on the payment of which they would delay the sale of the vessel, and take all possible care of her for the benefit of whom it might concern.

The defendants, afterwards, refused to pay the bond, and the vessel was sold, and the proceeds applied to the discharge of the bond.

A verdict was taken for a nominal sum, and it was agreed that the amount for which a judgment was to be entered, should be liquidated by two persons named, on such principles as the court should direct.

*Hoffman*, for the plaintiffs. In consequence of the capture and condemnation, the plaintiffs had a right to abandon for a total loss. An abandonment having been duly made, the master became the agent of the defendants; and his acts cannot affect the plaintiffs who have never adopted them. Though the master may, by his acts, turn a partial into a total loss; he cannot, without the assent of the assured, convert a total into a partial loss. So far from adopting the acts of the master in this case, the plaintiffs always communicated them to the defendants, at the same time insisting upon and confirming their abandonment, made on the 1st of *June*, 1808.

But admitting that the master was the agent of all parties, he was not bound to prosecute the appeal; and having acted *bona fide*, and by advice of counsel, his conduct cannot deprive the plaintiffs of their right to recover for a total loss. In *Cheviot* v. *Brooks*,[*] which was an action against the master, for his negligence and misconduct, in not protecting the property captured, it was held to be altogether a question of *good faith*. The acts of a mutual agent do not prejudice the rights of either party under the contract, though they may affect the interest of one and not of the other. Neither party guaranties the acts of a mutual agent. Even if the appeal had been voluntarily withdrawn by him, still the rights of the plaintiffs, under the contract, remain the same.[†] If the master before a condemnation obtains the restoration, or there is a recapture, it will take away the right of abandonment. But if the master should neglect to obtain a restoration, or to interpose a claim, when he ought so to have done, his negligence or misconduct does not affect the right of the insured under the contract. The master, in this case, was not able to obtain a restoration until after an abandonment had been made.

It may, perhaps, be said, that the agreement made by the master was for the benefit of the cargo. If so, it may possibly furnish a claim on the underwriters on the cargo; but it cannot affect the plaintiffs' right of recovery on the present policy. Though the cargo was incidentally benefited, yet the arrangement was also advantageous to the insurers on the ship; for she was purchased for a sum less than she was, afterwards, sold for here; and she also earned freight. If no such arrangement had been made, the defendants would have been liable for the whole amount insured.

The abandonment was made on the 1st of *June*, and the purchase was made the 3d of *June*, and was not ratified by the king in council until the 14th of *june*,

* 1 *Johns. Rep.*
364.

† 2 *Caines'
Cases in Error*,
47. 62. *Ludlow*
v. *Simond.*

when the permission was given to the ship to sail with her original papers; and the purchase would have been of no avail without such license. If an *American* vessel loses her papers, by which her neutral character is affected, by a peril within the policy, it is a ground of abandonment. The effect of a purchase or compromise made by the master, after abandonment, on the rights of the parties, has been decided.\* The insurers may always elect to consider the purchase as made for their benefit; and the insured are bound to render them an account. The insured may also elect to take the purchase; but if he does so, it is a waiver of the abandonment. But a mere purchase by the master does not, *ipso facto*, turn a total into a partial loss. The insured, unless he does some act adopting the purchase, is not to be prejudiced by it. The cases of *Abbott* v. *Broome*, and *Saidler &* *Craig* v. *Church*, are much stronger than the present. The rights of the plaintiffs were fixed by the abandonment,† and cannot be changed by subsequent events, as they have done no act amounting to a waiver.

Then, considering this as a total loss, what is the amount which the plaintiffs are entitled to recover? We contend that the defendants are to be charged with the amount of the policy, and interest thereon after 30 days from the time of abandonment, and with the *bottomry* bond, or the amount paid for the vessel in *England*, with the commissions, bottomry interest, and exchange; and they are to be credited with the net amount of freight received, with interest, and the net amount of the sale of the vessel, with interest, and the balance is the sum for which the plaintiffs are entitled to judgment. It is to be presumed that the bottomry bond was given for a necessary and just cause, in order to procure the liberation of the vessel and cargo. By the capture and condemnation the insured ceased to be owners. The holder of the bottomry bond, after the purchase, is to be considered as

ALBANY,
Feb. 1811.

JUMEL and
DESOBRY
v.
MAR. INS. Co.

\* *M'Masters* v. *Shoolbred*, 1 *Esp. Cas.* 237. *Abbott* v. *Broome*, 1 *Caines' Rep.* 292. 1 *Johns. Rep.* 592. 5 *Johns. Rep.* 810. 321. 1 *Johns. Rep.* 406. *Mar. Ins. Co.* v. *Tucker and others*, 3 *Cranch's Rep.* 357. 2 *Caines' Rep.* 280. 301.

† 1 *Caines' Rep.* 444. 4 *Dall. Rep.* 446. *Dutith* v. *Gailiff*, 3 *Mass. Rep.* 37. 56. *Oliver* v. *Newb. Mar. Ins. Co.* 1 *Term Rep.* 608.

ALBANY,
Feb. 1811.

JUMEL and
DESOBRY
v.
MAR. INS. CO.

* Smith v. Wil-
liams, 2 Caines'
Cases in Error,
110.

† M'Grath and
Higgins
Church,     1
Caines'    Rep.
196.

the legal owner, leaving to the insurer or insured an equitable interest only.* As the defendants, to whom the ship was abandoned, refused to pay the bottomry bond, she was sold for that purpose. The reason assign-ed by the defendants for not paying the bond, was, that there were *items* included which were general average. But the bottomry was on the ship, and they or the ship must be liable for it. They are answerable, also, in the first instance, for the whole amount of the general ave-rage, and must look to the other parties for contribu-tion.† While the bottomry continued, the plaintiffs never could be deemed to be restored to the ownership or do-minion of the vessel.

Again, the plaintiffs having paid more than a moiety of the *value* of the ship, by way of salvage, or to pro-cure her liberation, were entitled to abandon on that ground.

On the supposition that the plaintiffs are only to reco-ver for a partial loss, they are entitled to receive, besides the general average and charges against the ship, the amount paid for the ship in *England* and commissions, the bottomry interest, commission and exchange, together with the interest from the time the bond was paid.

*Robinson* and *Colden*, contra. Any interference of the insured, or their agents, after the event has happened, which is the ground of abandonment, is a waiver of the abandonment. The authority of the insured to interfere is derived from the clause in the policy, which makes it lawful for them to sue, labour, &c. for the defence, safe-guard, and recovery of the property; and any interfe-rence on their part, beyond this, is a waiver of the right of abandonment. Whose agent, then, was the captain, when he withdrew the appeal? From the time of the happening of the events which would authorize an aban-donment, until the insurer has made his election to ex-ercise his right, the master is the mutual agent of both

parties; and while he acts *bona fide* for the concern, his conduct will not prejudice either party; but if he act *mala fide*, or against the interest of the concerned, the insurer is not to be prejudiced by his acts.\* He may ransom or purchase the vessel before condemnation; and we do not mean to say that he may not relinquish an appeal, *bona fide*, for the interest of both parties; but unless he acts for the benefit of the insurers, they are not to be affected by his conduct.† The master did not act for the benefit of the defendants; for he gave more for the vessel than she would have sold for at auction; and the premium paid for the money advanced far exceeds the freight. The plaintiffs were also owners of the cargo, and the appeal as to the ship was withdrawn in consideration of the appeal as to the cargo being relinquished. The arrangement was a matter of speculation, if not a fraud. The property was warranted *American*, and condemned as belonging to an enemy; but how could the plaintiffs say that the decree would not be reversed, when it was in their power to establish the truth of their warranty? There was no necessity to sacrifice the vessel for the liberation of the cargo; and the chance of being subject to costs would not justify the withdrawing the appeal. The master is bound to use the utmost vigilance for the preservation of the property intrusted to his care. Admitting that he is not obliged to enter an appeal after condemnation, still, after he has, in fact, entered an appeal, he is bound to prosecute it. The appeal would not have been entered, if he had not been advised that there was a prospect of its reversal. Though he was not bound to take upon himself the employment of master, yet, having done so, he is obliged to proceed and discharge all the duties of a master. As well might it be pretended, that after a decree of restitution, the master is not obliged to sue out a writ of *unlivery*.

Though an abandonment has relation back to the

ALBANY,
Feb. 1811.

JUMEL and
DESOBRY
v
MAR. INS. Co.

\* *Park*, (6th edit.) 88. 1 *Bl. Rep.* 313.

† *Dederer* v. *Del. Ins. Co.* *Condy's* edit. *Marsh.* 615. in note. 1 *Johns. Rep* 141. 2 *Caines*, 301. 1 *Term Rep.* 608 *Doug.* 219.

cause, yet it is only in order to ascertain the rights of the parties, not in relation to the conduct of the master.

Whether the insured is to recover according to the state of the subject at the time of the abandonment, or at the time of bringing the action, seems not to be fully settled; but admitting that the rights of the parties were fixed by the abandonment, the only subject which the plaintiffs had to abandon, after condemnation, was a right of appeal; and they had voluntarily relinquished that right. By the entry in the records of the court, an end was put to all further prosecution of the appeal. After this right was relinquished, an abandonment was an idle and useless ceremony; for there was nothing to abandon. The withdrawing of the appeal ought then to be considered as a waiver of the right to abandon. Again, the agreement with the captors was entered into before the abandonment; for Messrs. *Batard, Sampson & Sharp*, in their letter, dated the 1st of *June*, 1808, say, that in their letter of the 5th of *March* they informed the plaintiffs that the master had gone down to *Plymouth* to purchase the vessel, and that he had written that he had agreed with the captors for the purchase at 1,300 pounds; and that the original papers had been forwarded to *Plymouth;* so that the vessel was, in fact, in the possession of the master prior to the 1st of *June*, though the formal agreement was not executed until the 3d of *June*.

Whether this is a total or partial loss does not depend on the election of the insured. The case of *Abbott* v. *Broome* is not applicable. There the ship was condemned as incapable, from the injuries sustained by the perils of the sea, to proceed on her voyage, unless repaired at an expense equal to her value. In *Saidler & Craig* v. *Church*, the question whether there was a total or partial loss was not raised. The only point in controversy was, whether the act of the master did not amount to a waiver of the abandonment.

Again, the defendants are not liable for the bottomry bond, nor for any charges of commissions or exchange. *Batard, Sampson & Sharp,* the correspondents, had no right to take a bottomry bond. In *Read & Jephson* v. *The Commercial Insurance Company,*[*] it was decided, that the insurers were not liable for a bottomry bond taken by a *consignee* for money advanced to the master for the use of the ship. In the case of *Rucker & Co.* v. *Conyngham,*[†] in the district court of *Pennsylvania,* it was held that the *correspondents* of the owners cannot recover *marine* interest for money advanced to the master for repairs of the vessel. A master has no authority to execute a bottomry bond, unless in case of extreme necessity, and when there is no other means of procuring the money.[‡] If he can obtain money on the personal credit of the owners, or has goods or funds in his hands, he cannot pledge the ship. If the goods of a stranger are on board the ship, they may be taken and sold by the master, in a case of necessity.[§]

. Then look at the *bona fides* of this transaction. *Batard, Sampson & Sharp* charge commissions, &c. a premium of 21 *per cent.* on the whole bond, and the difference of exchange, making in the whole about 1,134 pounds for an advance of about 1,900 pounds.

*T. A. Emmet,* in reply. The rights of the insured are not to be destroyed by the acts of third persons, without his knowledge or consent. *Batard, Sampson & Sharp* put in the claim in behalf of the plaintiffs, and withdrew the appeal. It was not the act of the master. They were strangers or volunteer agents, in a case of necessity, for the benefit of all whom it might concern. The acts of a mere volunteer agent cannot affect or destroy the rights of the parties. If, by the operation of law, the defendants had become liable for a total loss, the claimants must be considered as acting for them; for the abandonment retrospects to the time of capture. The master,

ALBANY,
Feb. 1811.

JUMEL and
DESOBRY
v.
MAR. INS. Co.

[*] 3 *Johns. Rep.* 352.

[†] *Peters's Adm. Decis.* 295.

[‡] See Judgments in the Admiralty Court of *Pennsylvania,* by *Hopkinson,* in 1785 and 1786. *Appendix to Bee's Adm. Rep.* 339. 353. *Molloy,* b. 2. c. 11. s. 91.

[§] 6 *Johns. Rep.* 116.

by the contract between him and the ship-owners, is their
agent; but by the condemnation there was an end to his
contract or employment as master. He was at liberty to
return home; for he had no further duty to perform as
master. Whatever he does after condemnation, must
be considered as done by a volunteer agent, *ex necessi-*
*tate;* and his acts affect those only whom it may happen
to concern. Though his acts, done *bona fide*, may benefit
the insured, they cannot be prejudiced by what he does
*mala fide*. The master was not bound to prosecute the
appeal, for he put in no claim; and he was not bound to
enter a claim. If no claim had been interposed, the pro-
perty would have been irrevocably fixed in the captors.
Are the defendants, then, in a worse situation now,
when, though a claim has been put in, the appeal, on de-
liberation and advice, was relinquished? Besides, the
withdrawing the appeal did not destroy the rights of the
insurers, for, by the statute of 33 *Geo.* III. c. 66. s. 29.
any person may put in an appeal within fourteen days.

But if the master in this case acted *bona fide* in
making the compromise, all parties must be bound.
Counsel were of opinion that the sentence of condemna-
tion would be affirmed, with costs. It was the duty of
the master not to prosecute it; and while he discharged
his duty by this arrangement with the captors, he inci-
dentally conferred a benefit on the owners of the cargo.
If nothing had been done, the defendants would have
lost the whole. It was for their interest that the vessel
should be sent back with her original papers, without
which she would have lost her *American* character. This
was a sufficient reason for giving a greater price than if
she had been sold at auction. The purchase was, in
truth, a *bona fide* transaction, and for the benefit of all
concerned.

It is said that the vessel was restored before action
brought; but it is settled, that the rights of the parties
are fixed by the state of things at the time of the aban-

donment.* But how can the vessel be said to be restored before action, when she comes charged with a bottomry bond to more than half her value, and for the payment of which she may be libelled and sold? On this ground alone the plaintiffs have a right to abandon. Admitting that the master had no right to execute the bottomry bond, yet the defendants must be liable; for, rejecting the *marine* interest, the principal sum to be paid amounts to a technical total loss.

KENT, Ch. J. delivered the opinion of the court. Here was, clearly a case of total loss. The vessel was captured and condemned, and it is not pretended that there was a breach of warranty. The plaintiffs were therefore entitled to abandon, and they accordingly did abandon on the first of *June*, 1808. The master, in consequence of his abandonment, became the agent of the insurers, and the plaintiffs are not bound by his subsequent acts, unless they have adopted them. It was not in the power of the master, by any act of his, to change the total loss, thus fixed by the abandonment, into a partial loss, without the subsequent assent of the assured, and there is no evidence in the case of any such assent, or of any adoption of his acts. The purchase of the vessel by the captain was for the benefit of the insurer, if he chose to take it, and if he did not, still the refusal does not affect the abandonment, or the rights of the other party. These principles are well settled, and have frequently been brought into view in cases before this court. (*Saidler & Craig* v. *Church*, cited in 2 *Caines' Rep.* 286. *Abbott* v. *Broome*, 1 *Caines' Rep.* 292. *United Insurance Company* v. *Robertson & Hartshorne*, 2 *Caines' Rep.* 280.) In the case of *Miller & Graham* v. *Depeyster & Co.* (2 *Caines' Rep.* 301.) the master made a composition with the captor after a total loss followed by an abandonment, and the insurer was held to be answerable for the total loss, and to be

ALBANY,
Feb. 1811.

JUMEL and
DESOBRY
v.
MAR. INS. Co.

\* *Mumford* v. *Church*, 1 *Johns. Cas.* 147. *Slocum & Burling* v. *Unit. Ins. Co.* 1 *Johns. Cas.* 151. See also 4 *Dal.* 446. 4 *Cranch*, 29. 4 *Mass. Rep.* 238. But see 1 *Caines' Cases in Error*, 21. 3 *Caines' Rep.* 157.

entitled to the benefit of the composition. The master is not bound to prosecute the appeal. (3 *Term Rep.* 477.) There is no case which imposes this as an indispensable duty upon the master. He is only bound to act with good faith, and sound discretion, in respect to the interest under his charge; and the compromise in this case appears to have been made under the influence of both these considerations. But whatever might have been the merit or demerit of his conduct, after the total loss became fixed, is immaterial in the present case. The purchase was not made until the 3d of *June,* and the loss continued total to the time of abandonment. If the captain had afterwards been wanting in a faithful discharge of his trust, he would have been answerable to the insurers.

The plaintiffs are accordingly entitled to recover as for a total loss, and the remaining inquiry is as to the principles upon which the accounts are to be adjusted, taking the ground of a total loss.

According to the settled construction of the general permission granted by the policy, to labour, &c. the insurer is liable to expenses incurred in the attempt to recover the captured property, in addition to the payment of a total loss. The amount of the total loss chargeable upon the defendants is the sum subscribed, with interest thereon from the 1st *July,* 1808, and we are to determine what expenses they are chargeable with in addition to this subscription.

The defendants are chargeable with their proportion of the expenses incurred in endeavours to protect and reclaim the property prior to the time of the composition made by the captain; and these expenses are to be apportioned upon the principles of a general average. They were incurred for the joint benefit of the ship, freight and cargo, as all were equally put in jeopardy by the capture. The defendants ought not to be responsible beyond that share of the expenses, which, upon the

principles of a general average, will fall upon the ves-
sel. The rule in *Maggrath & Higgins* v. *Church*, (1
*Caines' Rep.* 215.) does not apply to a case like this,
where ship, freight, and cargo belong to the same per-
son, and when it does not appear that the other sub-
jects are insured. Why should the plaintiffs recover
the whole general average of the defendants, when they
would, by that very act of recovery, and immediately
upon receipt of the money, become answerable over to
the defendants for that proportion of the average which
ought to be borne by the cargo and freight? Nothing
could be more disgusting than the operation of such a
rule, and it would be perverting the very ground and
principle of the other decision.

In calculating these expenses, the defendants are not to
be answerable for *marine interest*, but only for the ordinary
legal interest on the sums advanced. The defendants
have never accepted of the ship, or chosen to avail
themselves of the benefit (if a benefit it was) of the
captain's purchase. Had they elected to affirm the
purchase, and take the ship, they must have taken her
*cum onere*, and with the encumbrance of the bottomry
bond. But they were not bound to ratify that pur-
chase, and as they have not done it, they have nothing
to do with the vessel, or the bottomry bond, or the
net amount of the freight, or of the sale of the vessel.
They are only to pay the total loss with their propor-
tion of the expenses incurred in labouring for the safety
and recovery of the vessel, freight, and cargo, prior to
the composition made with the captors. These ex-
penses might undoubtedly have been raised by other
means than by a bottomry bond, and that step ought not
to be resorted to until all other means have failed.
This was so held by this court in *Reade* v. *Commercial
Insurance Company;* (3 *Johns. Rep.* 352.) and it is a
well settled rule on the subject. It is for this reason

that the insurers are not here to pay marine interest; and that they have nothing to do with the purchase of the vessel, unless at their election, is a general principle in insurance, for which it will be sufficient here to refer to a passage in *Emerigon.* (*Tom.* 1. 470.) "The insurers are not bound to avail themselves of the benefit of a composition. It is sufficient that they pay the total loss when demanded. If they will not take to themselves the profit of the composition, they are still bound to pay the total loss, and in such a case they have no right to the subject repurchased; so there is no foundation for a claim upon them to contribute to the expense of the repurchase, as it is an act to which they are strangers, and which they are at liberty not to adopt, lest it might expose them to still greater loss."

Upon these principles, the referees mentioned in the case are to adjust the amount of the recovery.