## WOODS v. OLSEN.

(Circuit Court of Appeals, Fifth Circuit. January 23, 1900.)

### No. 847.

SHIPPING—GENERAL AVERAGE—SEIZURE OF SHIP AS PRIZE—EXPENSE OF OBTAINING DISCHARGE.

Libelant chartered a steamship by a time charter, and afterwards subchartered her to a third person, by whom she was employed in trade with Cuba. While so employed, she was seized, with her cargo, by the United States as prize, during the war with Spain, but on trial was released. The owner, libelant, and the subcharterer each refused to pay the expense incurred in obtaining her discharge, for which she was detained, but subsequently, at request of the owner, libelant paid a draft drawn by the master for the amount. *Held*, that such expense was a subject for general average, to be apportioned between the ship, cargo, and freight, and that libelant, having neglected to proceed for that purpose until the contributing interests had been separated, could not recover the amount of the draft in a suit in personam against the owner.[1]

Appeal from the District Court of the United States for the Eastern District of Louisiana.

On December 23, 1897, John G. Woods chartered from the owners the steamship Franklin for a period of six months, with option to renew for period of three months; the charter party containing, among others, the following stipulations: "Between safe port and ports in Canada (and) (or) other British possessions, not north of River St. Lawrence (steamer to leave the St. Lawrence by the 31st of October), (and) (or) the United States of America (and) (or) West Indies and Gulf of Mexico, (and) (or) Carribean Sea, (and) (or) Central of Mexico, (and) (or) South America (Magdalena river excluded), not south of the river Platte, as the charterers or their agents shall direct, on the following conditions: (1) That the owners shall provide and pay for all provisions, wages, and consular shipping and discharging fees of captain, officers, engineers, firemen, and crew; shall pay for the insurance of the vessel; also for all engine room and deck stores; and maintain her in a thoroughly efficient state, in hull and machinery, for and during the services, guarantying to maintain the boilers in a condition to bear a working pressure of at least 60 pounds (and this pressure to be carried continuously) during the whole term of this charter, and to victual and provide for all passengers in the best manner according to their class, charterers paying at the rate of 4s. sterling per day for each first-class passenger. (2) That the charterers shall pay and provide for all the coal, port charges, pilotages, agencies, and commissions, and the charterers shall accept and pay for all coal in the steamer's bunkers on delivery, at the rate of $——— per ton; and the owners shall, on expiration of this charter, pay for all coal left in the bunkers, at the current market price, at the respective port where she is delivered to them. It is understood that the steamer must have sufficient coal in bunkers, on delivery, to take her to New Orleans, La. (3) That the charterers shall pay for the use of said vessel (£475) four hundred and seventy-five pounds British sterling, lump sum, per calendar month, commencing from the time the vessel is entered at the custom house and placed with clear holds at charterers' disposal, and at and after the same rates for any part of the month, hire to continue, from the time specified for terminating the charter, until her delivery to owners (unless lost) at a port in the United States. (4) Payment of said hire to be made in cash in New Orleans, La., at the rate of $4.85 per £ sterling, half monthly in advance, from the date of delivery of steamer; and, in default of such payment, the owners shall have the faculty of withdrawing the said steamer from the service of the charterers without prejudice to any claim they (the owners) may otherwise have on charterers

---

[1] As to general average, see note to Pacific Mail S. S. Co. v. New York, H. & R. Min. Co., 20 C. C. A. 357.

in pursuance of this charter. * * * (9) That the captain, although appointed by the owners, shall be under the orders and direction of the charterers as regards employment, agency, or other arrangements; and the charterers hereby agree to indemnify the owners from all consequences or liabilities that may arise from the captain signing bills of lading, or otherwise complying with their orders and directions. (10) That, if the charterers shall have reason to be dissatisfied with the conduct of the captain, officers, or engineers, they shall make such complaint in writing to an agent in New Orleans, La., specially appointed by owners, who shall have full power to act on their behalf, and, if necessary, dismiss any of the officers, should they find the complaints made by the charterers are justified and proven. * * * (14) That in the event of loss of time from deficiency of men or stores, or break down of machinery, or damage preventing the working of the steamer for more than twenty-four hours at sea, the payment of hire shall cease until she be again in an efficient state to resume her service; and should she, in consequence, put into any port other than that to which she is bound to, the port charges and pilotages at such port shall be borne by steamer's owners; but should the vessel be driven into port or to anchorage by stress of weather, or from any accident to the cargo, such detention or loss of time shall be at the charterers' risk and expense; also, if any loss of time from crew or stores not being on board in time, or from repairs to hull and machinery, which are for owners' account, not being complete after cargo and coals are on board, and hour of sailing has been fixed by charterers, and notice given to captain, the time lost is for the steamer's account. * * * (17) That the owners shall have a lien upon all cargoes and all sub-freights for any amounts due under this charter, and the charterers shall have a lien upon the ship for all moneys paid in advance, and not earned. (18) Ship bottom to be kept properly cleaned, and steamer to be docked whenever captain and charterers may think it necessary, but at least once in every six months, and payment of the hire to be suspended until she is again in proper state for the service."

After Woods obtained possession of the steamship, he, styling himself "John G. Woods, chartered owner of the good iron screw steamship Franklin," subchartered her to one McManus, of Mexico; the terms of this second charter party being similar to the first in all material matters. Thereafter the Franklin was used by McManus as a general ship between Mexican and Cuban ports. About this time a state of war existed between the United States of America and the kingdom of Spain, and the master of the ship became uneasy, fearing capture in running to Cuban ports. When first ordered to sail from Vera Cruz to Cuba, the master declined to load or proceed. He waited some weeks before deciding to take cargo, and in the meantime communicated with his owner in Norway, and the owner's agents in New York. Under their advice, he took cargo and proceeded to Cuba. On this trip he was overhauled by an American man-of-war, but, after an examination of his papers, he was allowed to proceed. This voyage was successfully made, and a second one followed. Having received a cablegram from the agent of the owner in New Orleans, warning him against carrying contraband of war to Cuban ports, he again took the advice of owner's agent, but, on receiving instructions not to carry contraband nor run blockade but proceed, he loaded, and made a successful voyage to the port of Cayberrien, in Cuba. August 2, 1898, while unloading in that port, and before cargo was discharged, the Franklin was seized by the United States gunboat Syren, and, with the balance of her cargo, about one-fifth, was taken to Key West, with a prize crew on board, and then proceeded against in the United States district court as a prize of war. On the 17th of the same month, after various proceedings and expenses incurred for the purpose, the ship was discharged. The expenses in procuring her release, counsel fees, costs, and other matters amounted to about $1,200. Before the ship could leave Key West, it was necessary that these expenses should be paid. Then followed a call upon Woods to pay, and his refusal. Woods called upon the owners' agents, and they refused, and a call was made upon the subcharterer, McManus; and he refused, and demanded to have his ship. After some telegraphic correspondence between owners' agents, charterers, and master, the owners' agents in New York wired agent at New Orleans as follows: "In order save time, have Woods wire captain money. Notify him proceed New

Orleans after Havana." Upon that dispatch, the New Orleans agent, on suggestion and with consent of Woods, sent the following:

"New Orleans, La., August 23rd, 1898.

"Captain Sassummussen, Norwegian Stmr. Franklin, Cqre [Care] Taylor; Norwegian Consul, Key West, Fla.: Your draft on Woods for twelve hundred' dollars will be honored at sight. I guaranty same to cover disbursements. Proceed Havana; thence New Orleans. Do not deliver cargo to Ybanez, Alvare & Co., unless they pay Key West disbursements. Advise sailing.

"[Signed]                                              Geo. W. Kelley."

The master then drew draft, of which the following is a copy:

"Exchange for $1,200.

"Key West, Fla., Aug. 24th, 1898.

"At sight pay this first of exchange (second unpaid) to the order of Mess. Taylor & Co., twelve hundred dollars, a/c necessary expenses Nor. S. S. Franklin, at this port, value received, and charge the same to account of said stmr.

"[Canceled Internal Revenue Stamp.]              D. Rasmussen, Master.

"To John G. Woods, New Orleans, La."

Woods paid this draft. From its proceeds the master paid off his obligations in Key West, and thence, according to orders, proceeded to Cuba to deliver the balance of his cargo, then returned, and reported to charterer Woods, and, thereafter, under a renewal of the charter party, proceeded to run in Woods' interest, making frequent trips to New Orleans and Central America, until December, 1898, when the charter expired, and the ship was returned to her owner.

The first attempt to collect the money advanced by Woods to release the ship at Key West was from the consignees of cargo in Cuba. The master was ordered not to deliver cargo unless the payment was made, but, on the refusal of consignees to pay, that order was countermanded. Woods also made unavailing efforts to collect the amount from the subcharterer, McManus. As the owner of the ship refused to pay, he then thought of retaining the amount from the advance payments of the ship's hire, but abandoned this mode of collection for fear that perishable cargo aboard the Franklin would be seized. Finally, in January, 1899, the steamship Franklin then being in this port, Woods instituted this suit in personam, coupled with a foreign attachment, wherein the ship Franklin was seized. The district court rejected the libelant's demand, and he now prosecutes this appeal, assigning as error. that the court erred in holding that the expenses in releasing the steamship Franklin from seizure in the port of Key West, and in defending the suit against her for forfeiture, were expenses for which the libelant was liable, and that the court erred in refusing to allow the recovery by libelant for the amount herein sued for, and dismissing the libel.

Hewes T. Gurley, for appellant.

Richard De Gray, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The libelant contends that he was not liable for expenses incurred in releasing the ship from capture, and had no interest in the matter as to whether she was released or not, except that he desired to avail himself of an option to extend the time of the charter, and that he paid the money at the request of the owner, for his account, and understood he would be reimbursed. The claimant, on the other hand, denying that he ever recognized the subcharter or was bound thereby, contends that, under the terms of the first charter party, there was a demise of the ship to the charterer, Woods, as owner pro

hac vice, who, as such owner, was responsible for the obligations of the ship; and particularly, as it was through Woods' fault that the vessel was engaged in the Cuban trade, where there was danger of her capture, the claimant contends that the ninth clause of the charter party, to the following effect: "And the charterers hereby agree to indemnify the owners from all consequences or liabilities that may arise from the captain signing bills of lading or otherwise complying with their orders and directions,"—rendered the charterer liable for these particular expenses, because the capture resulted from the employment the charterer gave the ship. Each party supports his contention by elaborate argument and citations of many authorities, but we are unable to agree with either. The expenses necessary to release the ship from the capture which involved the ship, cargo, and freight was a subject for general average. Douglass v. Moody, 9 Mass. 548; Sansom v. Ball, 4 Dall. 459, 1 L. Ed. 908; Jumel v. Insurance Co., 7 Johns. 412; Spafford v. Dodge, 14 Mass. 66. This last-cited case is very interesting, and we quote from it at some length. Under the charter party in that case the charterers had more control than in the present instance, for they were required to victual and man the vessel, as well as pay all port charges, pilotage, etc. The vessel, on a voyage from St. Ubes to Boston, was forcibly taken by a British cruiser as a prize of war on the 6th of January, 1843, and detained until the 10th of May following. The main issue in the suit was as to whether the charterers were liable for hire of the ship during the time lost by the capture. The court held that the charterers were liable for the hire. In regard to this the court said:

"The defendants, by virtue of this charter party, became the owners of the ship for the voyage, or for the time stipulated in the contract. They might load her themselves, or take freight for others on such terms as they should think proper. The whole earnings of the ship, in either case, were for their use. If she should perform her voyage in a short time, the gain would be theirs. They would have the same benefit, whether as freight on their own goods or on the goods of others, as if the voyage had been unusually prolonged, while the expenses of wages and provisions which were to be paid by them would be reduced. On the other hand, if the voyage should be delayed by adverse winds, or by any other of the common casualties or occurrences, the defendants would sustain the whole loss arising from that circumstance. They would be held to pay the increased hire and expenses of the ship and the crew, while their freight or profits from the voyage would remain the same. The plaintiffs had sold their ship for the time to the defendants, to be used in any manner not inconsistent with the contract, and, as they could gain nothing, so ought they not to lose, in consequence of the particular manner in which they should be employed by the defendants. If the plaintiffs had not thus parted with their ship, they might have taken freight, or employed her in some voyage on their own account; and, if it be said that the voyage might still have been prolonged by the same or the like accidents that have now occurred, the answer is that the owners in that case would have had the chance of a short and profitable voyage to compensate the risk of such a delay or detention. Suppose the owners had let their ship for a certain term of years, without designating any voyage or voyages in which she should be employed; they would certainly be entitled to the hire for the whole time, although the ship should remain in port the whole time, in consequence of an embargo, from not finding suitable employment, from fear of capture by an enemy, or any other similar cause. The application of these principles has never been doubted when the ship has been driven out of her course by a tempest, or delayed by adverse winds, and they have been applied, as before mentioned, when

she has been detained by an embargo. We can perceive no difference, as it regards this question, between a delay arising from any of those causes and that which has occurred in the present case. Here was a hostile seizure of the ship. This might have been followed by a condemnation as prize, which would undoubtedly have dissolved the contract of affreightment, but, in the events which have happened, it produced only a prolongation of the voyage. The ship was restored by the sovereign under whose authority she was seized. The captors, therefore, admit that they had no right to condemn the property or to deal with it as captured. It makes no difference that the ship was carried into a port of the captors for examination before she was restored. If this seizure produced a dissolution of the charter party, the same consequence would follow, however short might be the period of the detention, and whether she were restored by the captors upon examination of her papers at sea, or upon a like examination in port, or in a court of admiralty. * * * The necessary costs and charges, incurred and paid by the defendants in reclaiming and procuring the restoration of the ship and cargo, are undoubtedly to be allowed as a general average, and, when the amount is ascertained in the manner agreed by the parties, it must be apportioned, as usual, on the ship, cargo, and freight. The sum which may thus be found due from the plaintiffs will be deducted from that which is due to them on the charter party." Pages 71–74.

In the instant case, the record shows that the hire of the vessel was promptly paid for all the time lost during her detention under capture, and, if proceedings had been promptly instituted under general average adjustment, we are reasonably clear that the amount advanced by Woods to the master could have been lawfully apportioned between the ship, cargo, and freight. The adjustment should have been made at first port of detention, certainly before there was a separation of the contributory interests. 1 Pars. Shipp. & Adm. 486. As no such proceedings, however, were instituted before the three interests involved were separated, and the liens on them lost, we are inclined to the opinion that Woods' remedy to recover from any one of them is lost, because of his delay in asserting his rights; but we do not so decide in the present case, and, if Woods still has the right to have an adjustment and apportionment, he may assert it in a proper suit. In this case, there is no proof upon which to base a decree in favor of libelant for any amount. Under the circumstances, the decree of the district court dismissing the libel is amended by adding the words, "without prejudice to another action as counsel may advise," and as so amended is affirmed.