Shaw C. J.
delivered the opinion of the Court. This is *361 an action upon a policy of insurance, in which the plaintiff claims to recover for a total loss. It is not the intention of the Court now to give a final and definitive opinion upon the whole case, the facts reported not being sufficiently full and complete for that purpose ; but having formed opinions upon several of the questions raised in the report and discussed in the argument, on those points the Court will now state the result.
The main question is upon the plaintiff’s right to recover for a total loss. The policy was on the brig Leonidas, to and from all ports and places, during the term of twelve months from the 29th of December 1825, and until her arrival at a port of discharge in the United States. At the time this policy attached, the brig Leonidas was prosecuting a voyage from Buenos Ayres to China and back, the same having commenced the June preceding. On her return to the river La Plata in June 1826, war in the mean time having broken out between the governments of Brazil and Buenos Ayres, the port of Buenos Ayres was blockaded by a squadron of Brazilian vessels, by which the brig was captured on the 13th of June. The facts of the commencement of war and the establishment of a blockade of Buenos Ayres, were not known to the master of the Leonidas, till the time of her capture. The vessel was sent by the captors first to Monte Video, where the master and most of the crew were taken out, and thence,' under a prize crew, to Rio Janeiro, where she arrived about the 10th of July, and where prize proceedings were instituted by the captors. The mate of the vessel, Robert S. Pulsifer, having been left on board, soon after the arrival of the vessel at Rio Janeiro, on the 18th of July 1826, addressed a letter to the owner, stating the facts, which was received about the time of the notice of abandonment given by the plaintiff to the defendants. At the time of the capture the vessel, having been chartered for the China voyage by merchants, residents and citizens of Buenos Ayres, had on board a cargo, the property of those merchants. At Rio Janeiro, the vessel was proceeded against as prize of war, in the admiralty court, for the condemnation of the brig, as well as the cargo. A decree of restoration was obtained in the lower court, on February 5, 1827, from which an appeal was taken
*362 by the captors, and a final decree of restoration in the court ot aPPeaL, was made July 9, 1827. By an interlocutory order, at the instance of the agents of the owner, the vessel was appraised and delivered on bond, conditioned to pay the amount of the appraised value in case of the condemnation of the vessel. Thereupon the vessel was delivered to the agents, who had given this bond, September 14, 1826. Notice of abandonment was given by the plaintiff to the defendants, September 11, 1826, and they refused to accept the abandonment. These are the material facts and dates.
Several clauses in the policy are particularly relied upon and give rise to some of the questions discussed. They are these.
“ It is also agreed, that in case of capture or detention, the assured shall not have the right to abandon therefor, until proof is exhibited of condemnation, or of the continuance of the detention (by capture or other arrest), for at least ninety days.” —“ It is also agreed, that the assurers shall not be answerable for any charge, damage or loss, which may arise in consequence of seizure or detention for or on account of illicit or prohibited trade, or trade in articles contraband of war.”
Several letters which passed between the parties, in December 1826, are referred to.
The vessel having been captured within the time covered by the insurance, several objections are taken to the plaintiff’s right to recover.
First, that the loss did not happen by any one of the perils insured against, because the seizure and detention took place in consequence of illicit trade or trade in articles contraband of war, which were perils excepted from the risk by the terms of the policy. But there are no facts shown, upon which to found this objection. There is no intimation that the vessel sailed from or returned to Buenos Ayres, in violation of any of the laws of trade of that country ; and the objection is founded only upon the assumption that she was seized and detained for some supposed violation of the belligerent rights of Brazil. But this position cannot be maintained. When this vessel sailed from Buenos Ayres the preceding year, that *363 country was in a state of peace with Brazil; when she sailed from China on her return voyage, it is found that the master had no knowledge of the commencement of the war, of course none of the blockade of his port of destination, and that he spoke nothing and received no such notice, until he was actually captured by the squadron. There was manifestly therefore no violation of the belligerent rights of Brazil, in proceeding towards a blockaded port, without actual or constructive notice of the blockade. As little ground is there in point of fact, for charging that the loss was occasioned by trading in articles contraband of war.
Had this vessel been detained for the purpose only of taking out the cargo, which as the property of citizens of Buenos Ayres the forces of Brazil had a right, by the general laws of war, to make prize of, as enemy’s property, and had the brig only been sent to the nearest port under the dominion of Brazil, for the purpose of taking out such property, and then discharged, it might perhaps be successfully maintained, that under this policy, such a detention would not have been hostile, or one of the perils insured against, inasmuch as articles of merchandise, being enemy’s property, bound to a blockaded port, are to many purposes deemed articles contraband of war. But the facts will not warrant us in considering the seizure of this vessel as a detention for the sole purpose of taking out and discharging the cargo as enemy’s property. It is attended with all the characteristics of a hostile capture. After arriving at Monte Video, a port under the dominion of the government of the captors, the master is taken out and the vessel sent under a prize crew to Rio Janeiro, and there immediately libelled as prize ; and even after a decree of the court of first instance, for a restoration of the vessel, the captors, insisting with unwonted perseverance upon the condemnation of this vessel as prize, appeal from the decree to a higher court; and it is only upon a final decree of restoration by the appellate court that the owner obtains the discharge of his vessel from hostile detention. It seems impossible therefore not to consider this detention as a hostile capture. It seems very clear, as far as the facts appear, that there was ■no reasonable or probable cause for this capture and claim for *364 condemna-ion, it being a well established right of the neutral ship-owner, that his vessel is not liable to condemnation or detention for proceeding towards a blockaded port, until an attempt to enter, after notice of the blockade.[1] Here there having been no such notice, and there being no other ground to bring the case wifhin the excepted perils of illicit trade, or trade in articles contraband of war, and it appearing to have been manifestly a hostile capture, it is a loss within the risk taken by the policy.
This being a case not of actual, but of constructive total loss, the plaintiff cannot recover for a total loss, without a sufficient and valid abandonment ; and the defendants contend, that the notice of abandonment was given before the assured was entitled to give it, by the terms of the contract. This is founded upon the clause in the policy above cited, that in case of detention the assured shall not have a right to abandon therefor until proof is exhibited of the continuation of the detention for at least ninety days ; and here it is contended as a material fact to rebut the plaintiff’s claim, that the detention had continued. but thirty-five days when Pulsifer’s letter was written, and that the plaintiff could have had no later or other proof of detention, than that contained in that letter, at the time of giving notice of the abandonment. This clause in the policy, restraining the assured from abandoning for detention only, till after notice and proof of such detention having continued ninety days, is understood not to have been long in use, and has not often been the subject of judicial construction. In our view, the effect of it is, to retard and
postpone the right of abandonment for the term named, of ninety days , and as without such restraining stipulation, the assured cannot abandon until he has received intelligence of the capture, so under the clause, he cannot abandon until he has received intelligence and proof, that such detention has continued for the term of ninety days, and is in a condition to communicate such proof to the underwriter. As to the kind or degree of proof requisite to be furnished, we think it *365 is not such as would be required to sustain an action in a court of justice, but such as is usually produced to underwriters as preliminary proof of loss ; as the protest of the master, a letter from an officer or agent having charge of the vessel, or any such evidence as will satisfy the clause in the policy, requiring notice and proof of loss sixty days before the commencement of an action.
Taking this to be the true construction, it is very clear that at the time the notice of abandonment was given, September 11, 1826, the plaintiff had no proof and no intelligence later than the 18th of July, and therefore could give the defendants no proof that the detention had continued ninety days ; and of course that notice did not operate as a valid abandonment, so as to entitle the plaintiff at that time to recover as for a total loss.
But it is then contended by the plaintiff that this notice, although in fact too soon to operate as a valid abandonment of itself, still was a continuing notice ; that as it was never countermanded, as the plaintiff, with the knowledge of the defendants, continued to act upon it from time to time as a subsisting notice, it must be deemed to be a continuing notice ; and that as the detention in fact continued long beyond the period of ninety days, and intelligence and proof of it were received here and communicated to the underwriters, when this continuing notice of a determination to abandon and the notice and proof of detention beyond the period of ninety days concurred, the abandonment became complete ; and the Court are strongly .inclined to this opinion. The notice expressed the intention and determination of the plaintiff to abandon, on account of the alleged capture and detention which were specified ; the contract fixed the time at which the assured could notify with effect. This notice not having been countermanded, the assured continuing to act upon it with the knowledge of the underwriters, until the time arrived when by proof of the continuance of the detention the assured could notify his intention with effect, we think this was in effect a renewal, revival and continuance of such notice, and sufficient to give effect to the abandonment, in the same manner as if a new notice had been given, after intelligence and *366 proof received of detention ninety days. Columbian Ins. Co v. Catlett, 12 Wheat. 391.
It was stated by the plaintiff’s counsel in the course of the argument, that the plaintiff, by his acts and communications in several different instances, after the notice of September 11, 1826, and after receipt of intelligence that the vessel had been detained more than ninety days and before the commencement of the suit, did give the defendants proof of the detention of the vessel. On looking into the report,, the Court have not been able to perceive any admission or statement of the fact, that such proof was communicated by the plaintiff to the defendants, so as to give to the plaintiff’s continuing notice the effect of a valid abandonment. But as there is nothing to show that such proof was not given, and as it appears highly probable from the circumstances, that in fact it was given, or that evidence exists from which it may be inferred, the Court are of opinion, that unless the report can be so amended by agreement, as to determine that fact one way or the other, the cause should go to a jury for the purpose of determining it, and that a new trial must be had for that purpose.
There is one other point which it may be important to consider in the present stage of the cause, and that is, under the circumstances stated, to what period of time shall the detention occasioned by the capture be deemed to continue. The Court are all of opinion, that the hostile detention could not be considered as determined by the delivery of the vessel on bail, to the agents at Rio Janeiro, in the course of the proceedings against her as prize. If the vessel was in fact put into the possession of the owner, it was in consequence of an obligation having been entered into, in the event of the condemnation of the vessel, to return the vessel in specie, or to repay the full value. The jurisdiction of the prize court stands unaffected by such a delivery on bail; the security is substituted for the property itself to nearly every purpose, if not to all. The assured is in the nature of a purchaser for full value, and not restored to the free use and enjoyment of his property, under his former title. Considering therefore that hostile capture and detention, though without condemnation, is considered *367 by the genera, law of insurance as a constructive total loss ; that under the terms of this policy it is so to be regarded if it continues for the term of ninety days, the continuing of the prize proceedings by the captors’ insisting upon the condemnation of the vessel, must be legally deemed a continuation of such hostile detention, notwithstanding the delivery to the claimants’ agents on bail, until the final and effective decree of restoration made in July 1827, by the appellate court.
March 20th 1882

JYew trial granted.

The cause was tried a second time, when the facts before stated were again given in evidence. It further appeared, that when the brig arrived in Boston on December 1, 1826, the plaintiff received a letter from Clapp & Co., dated September 29, 1826, in which they state that they have thought it most advisable to clear the brig by giving bond ; that they are trying to cancel their bond ; that they fear it will take a long time to get through with the process of law, and that the former master of the brig has thought it advisable to remain there till the business can be brought to a close. This letter was immediately communicated to the defendants.
It appeared that the plaintiff, on receiving information that Clapp & Co. were continued agents for the claimants, after being appointed agents for the captors, immediately gave notice of this fact to the defendants, and inquired of them if it was their wish that he should withdraw the agency from Clapp & Co., and upon their reply that the agents for the captors were not fit persons to be agents for the claimants, the plaintiff wrote to Clapp & Co. under date of May 20 and June 14, 1827, requesting them to transfer the agency to another house.
According as the opinion of the Court should be, the plaintiff was to be nonsuited, or the defendants defaulted, and judgment entered for a total or partial loss, for an amount to be determined by an assessor.
J. Pickering and W. Phillips said it appeared that sufficient proof of the continuance of the detention for ninety days, was exhibited to the defendants on the 1st of December 1826, the letter of Clapp & Co. of September 29, 1826, *368 having then been shown to them. The defendants in effect waiyed any objection to the kind of document exhibited, contesting the loss solely on the ground that the abandonment was premature- Ocean Ins. Co. v. Francis, 2 Wendell, 64.
The defendants cannot make the objection that the same persons were agents of the captors and of the plaintiff, for the abandonment being valid, those persons were the agents of the defendants and not of the plaintiff. Idle v. Roy. Exch. Ass. Co. 3 B. Moore, 115, 150.
The bond given in the prize court is not to be taken as the measure of damages. If it were, the underwriters would be . affected by the fluctuation of the market. The bond was res inter alios, and was taken without any reference to insurance. The valuation in the policy is the real value as between the parties to this action.
S. Hubbard for the defendants. The abandonment on the 11th of September was invalid, because the plaintiff did not communicate to the defendants the whole of the letter received from the mate. The part not communicated contained facts, the knowledge of which was important to the defendants, in determining whether they should accept or refuse the abandonment.
Clapp & Co. being agents of the captors, as well as of the plaintiff, and having given their own bond on an appraisal of the vessel, we contend that she was released by agreement between the captors and assured. And this was in August within the ninety days. As the same persons were agents of the captors and of the plaintiff, all peril as to a delivery was over, and the plaintiff had legal constructive possession in August though an actual delivery was not made until the 14th of September. Marshall v. Delaware Ins. Co. 4 Cranch, 202.
So too the assured and the captors came to an agreement by which the utmost amount of the loss,was fixed, the bond being intended to cover that amount. The master had elected to take the vessel within the ninety days, and no more was at risk than the amount of this bond, and there.was no total loss. The Betsey, 5 Rob. Adm. Rep. 295 ; Humphreys v. Union Ins. Co 3 Mason, 429.
*369 March 30th 1832
Phillips, to the point that it was not necessary to communicate to the lefendants the whole of the mate’s letter, the extract being sufficient to put them upon inquiry, cited Pitney v. Learned, 1 Paige, 461 ; M'Intyre v. Bowne, 1 Johns. R. 240 ; Vos v. Robinson, 9 Johns. R. 192 ; Francis v. Ocean Ins. Co. 6 Cowen, 404.
Shaw C. J.
delivered the opinion of the Court. This cause again comes before the Court, upon a statement of facts somewhat more full and complete but in other respects not varying essentially from the former statement. The proof which was then wanting is now furnished. It appears that a letter written by the agents of the concerned for the vessel at Rio Janeiro, as late as the 29th of September, after the vessel had been detained much beyond ninety days, describing the proceedings in the court of admiralty as yet pending and undecided, was received here December 1st, and immediately communicated by the plaintiff to the defendants, as substantiating his claim to a total loss. That the defendants understood the plaintiff as still persisting in his cláim for a total loss, and relying upon his former notice of abandonment, is manifested by their reiterated refusal to accept it. The plaintiff having thus given notice of abandonment, operating as a good and valid prospective and continuing notice, and so considered by the company, and having exhibited proof of the continuance of a hostile detention for a period exceeding ninety days, the abandonment became complete and effectual, and thereupon the assured, according to the established rules of law, modified by the particular terms of this policy, became entitled to recover as for a constructive total loss. A letter under such circumstances must be considered as good preliminary proof, being that species of probable evidence upon which mercantile transactions usually proceed. Lawrence v. Ocean Ins. Co. 11 Johns. R. 260.
The Court have again been called upon to consider the question heretofore discussed and upon which an opinion was expressed, namely, whether the vessel could be considered as under detention within the meaning of the policy, after she had been delivered to the agents of the assured on bail. The Court are confirmed in their opinion, that such a delivery on *370 bail is no determination of the hostile detention. The proceeding is merely interlocutory, adopted for the convenience of litigating parties to avoid expense, and the vessel may be delivered to either party at the discretion of the court oí prize, before whom the proceedings are pending. It determines nothing upon the question of property, the only material question, the decision of which determines the regularity of the capture, and shows whether the vessel was or was not liable to capture and condemnation. This can only be determined by a decree of restoration or condemnation ; this only decides the right of property. Ogden v. Columbian Ins. Co. 10 Johns. R. 273.
It seems to be well settled, that in the admiralty, bonds are regarded not as a mere personal security to the party claiming, but as pledges and substitutes for the vessel, and liable to the adjudication of the court, upon all points regularly before it. So if the bond be to the captors and afterwards the vessel be condemned as a droit of admiralty, or to other parties claiming, the bond will be deemed security for the performance of such a decree. The Nied Elwin, 1 Dodson, 50. So it is held here, that where a stipulation is taken for property subject to legal process, the stipulation is deemed a substitute for the thing itself. The Palmyra, 12 Wheat. 1. Property thus delivered is still regarded as subject to the jurisdiction and order of the court, and the property itself or the proceeds may be brought in for further adjudication. Smart v. Wolff, 3 T. R. 323. As the court of admiralty exercises a jurisdiction according to the principles and forms of the civil law, in the absence of positive proof to the contrary, it is reasonable to presume that the courts of Brazil, acting in pursuance of the principles and practice of the civil law, adopt the same rules. If that be so, this vessel, notwithstanding the delivery on bail, was still subject to the order and control of the court of prize ; and although after the vessel had actually sailed from that country, they could not have had the physical control, or power to enforce any specific decree, yet the legal authority would have remained ; and until the vessel actually departed from the ports of that country, the prize court retained a legal control over the vessel, with the physical power to *371 enforce its mandates. This period continued for more than three months from the time of the capture. ,
But we do not place the decision principally upon this ground, being of opinion that after a hostile capture and detention and the institution of prize proceedings, the detention continues, until the determination of those proceedings, either by a voluntary discontinuance and a voluntary delivery of the vessel to the owner, unembarrassed by vexatious restraints, or a decree of restoration, which effectually revests the property in the owner, and places him in the same situation as before the capture.
An analogous case is, where a vessel having been plundered, seized, libelled upon a groundless claim, and delivered to the master, upon his depositing a considerable sum to abide the event of the adverse claim, it was held that notwithstanding the delivery of the vessel to the master, the assured had a right to abandon and recover for a total loss. M'Iver v Henderson, 4 Maule & Selw. 576.
But is it so clear, as contended for by the defendants, that the vessel was delivered to the owner on bail ? This depends upon the question, whether there was a good cause of abandonment, and whether the abandonment was valid. The claim to obtain the property on bail, was made by the agents, Clapp & Co., who had been appointed by the master, for the benefit of whom it might concern. If the abandonment was valid, on the ground of capture and detention, then the abandonment related back to the time of the capture, the master and the agents by him appointed were the agents of the defendants, the vessel was delivered to them as such agents, and came home under the direction of the master, as the property of the defendants. General Interest Insurance Co. v. Ruggles, 12 Wheat. 414. Had the plaintiff waived his abandonment and agreed to receive his vessel again, and affirmed the act of the agents in procuring the delivery of the vessel on bail, and that of the master in bringing the vessel home, as his act and done for his account, then the result would have been manifestly different; and in case of an after condemnation and a payment of the bond, the loss would have been in its nature a partial loss, and the amount paid on the bond, the measure of the *372 plaintiff’s indemnity. But as this was not done, their acts must ^e deemed to have been for the plaintiff or for the defendants, as they were the agents of the one or the other ; and this again depends upon the question, whether there was a valid abandonment. And if there was a good right to abandon upon other grounds, this delivery of the vessel to the agents, and her being brought home by the master, was no waiver of it.
One or two other points were made by the counsel for the defendants.
One was, that in the notice of abandonment, containing an extract from Pulsifer’s letter, there was a part concealed, which would have enabled the defendants to judge better of the expediency of accepting the abandonment. We think there is little weight in this objection. The main object was to communicate notice of the capture and detention, and of the intention of the assured to abandon. The portion of Pulsifer’s letter communicated was described as an extract, implying that it did not contain the whole ; if the defendants wished for the inspection of the whole, they should have called for it.
Another objection is, that Clapp & Co., the agents at Rio, were at the same time the agents for the captors ; and this leads to a suspicion of some fraud. If this were relied on as a fraud, it should have been tried. But as soon as the plaintiff heard of it, he communicated it to the defendants ; nor is there any intimation that it was done with his knowledge or approbation ; on the contrary, as soon as it was known, he took measures to counteract it. But another answer is suggested by the consideration before stated, that after capture and restraint, the master and the agents appointed by him, were the agents of the underwriters, and not of the assured.
As to the amount of damages. This is a valued policy. If the plaintiff is entitled to recover for a total loss, he must recover according to the agreed value. This necessarily re-. suits from this species of contract
Upon the foregoing opinion being given, the case was referred to an assessor to adjust the loss. The assessor reported that the excess of the premium over 2-| per ent *373 should be returned. • To this part of the report the defendants excepted, and the question xvas presented to the Court, whether the defendants had a right to retain the premium for any time after the expiration of six months from the commencement of the risk.
March 31*1, 1834.

March 22d,

Hubbard, for the defendants, contended that the premium should continue to run from the 13th of June to the 11th of September, and perhaps until December, when the abandonment became effectual. He cited Law v. Goddard, 12 Mass. R. 112.
J. Pickering and W. Phillips, contra, referred to Stevenson v. Snow, 3 Burr. 1237 ; Gale v. Machell, 2 Marsh, on Ins. (3d edit.) 667 ; Long v. Allen, ibid. 668 ; Meyer v. Gregson, ibid. 666 ; Tyrie v. Fletcher, Cowp. 666 ; Pollock v. Donaldson, 3 Dallas, 510.
Shaw C. J.
delivered the opinion of the Court. The introduction of new clauses into policies, naturally leads to new questions in the law of insurance. The stipulation, in the policy, in the present case, that no abandonment should be made on account of hostile capture or detention, until after proof of such detention having continued three months, is one of this character, and gives rise to the question presented by the report of the assessor, in his computation of the premium. The peculiarity of the policy in this case is, that the insurance was on time, for one year, and to continue for a further time, until the vessel’s arrival, if at sea at the expiration of the year, warranting a premium for at least six months. The vessel being seized and detained within the six months, the question is, whether the premium is to continue for any period beyond the six months, and if so, to what time it is to be computed.
It is obvious, that as the premium is expressly apportioned on time, it may be measured by the continuance of the risk, and must cease with it.
It may readily be admitted, that to some purposes the vessel may be considered | as the property .'of the assured at the risk of the underwriters, during the ninety days, which, by the terms of the policy, must elapse after furnishing proof of the detention, and before the assured have the right to *374 abandon. Thus, if there had been a new damage or loss, by ®re or 0{ber peril insured against, and the hostile detention should actually cease before the expiration of the ninety days; or, if the assured should elect not to abandon upon the original ground of capture and detention, and loss should arise in the mean time from some other peril, it seems quite clear, that in either of these cases the underwriters would be responsible for such new loss. And, at first view, it seemed reasonable to hold, that if in this, or any other way, the risk could continue during the ninety days, the premium should also continue.
But upon further consideration the Court are all of opinion, that the premium must stop at the time of the hostile detention, and that the computation of the assessor in this respect was correct.
We must consider, not what "would have been the mode of adjustment in other contingencies, but how the loss arising from this particular cause is to be adjusted, upon the events as they have happened. The capture and detention took place in June, information of the fact was received here in September, and notice of an intention to abandon was then given; but at that time, as the assured could not give proof that the vessel had been detained ninety days, by the terms of the policy he had no right to abandon, and his notice could only operate prospectively. The effect therefore is to postpone the right of abandonment, for the cause of that detention, ninety days beyond the time limited by law where there is no such stipulation. But it has already been decided, that this notice, not countermanded, but acted upon as soon as the assured was in a condition to act upon it, was a continuing notice ; and as proof was received here and offered to the underwriters in December, that the ship had been detained, actually or constructively, for more than ninety days, at that time, the abandonment took effect, and vested in the assured the right to recover for a total loss by capture and detention. The right of abandonment, which would have existed at the moment of receiving information of the capture, but for the clause in the policy, was only postponed ; but when this detention had continued during the stipulated period, the right became *375 perfect, and was exercised, and then the assured became entitied to recover in the same way and upon the same grounds as he would have been upon an immediate abandonment, under a policy in common form. The result shows that there was a total loss by the capture and detention on the 11th of June, and the abandonment refers to that cause, and relates to and takes effect from that time. The consequence is, that the underwriters, by force of the abandonment, became owners of the vessel from that time, paying all expenses and being entitled to all earnings, salvage and other benefits. If she.was discharged on bond and came home, it was for their benefit and at their own risk. It would therefore be inconsistent with the principles of abandonment, to require the former owner, upon a policy on time, to pay a premium on a vessel belonging to the underwriters, sailing for their benefit, and at their own risk, as owners.
It may seem to be a hardship, that the owner should have ninety days to speculate upon events, and determine whether he will or will not abandon, and thereby in effect to elect whether he will keep the vessel himself or relinquish her to the underwriters, according as his own interest may dictate. But this is, an advantage which the underwriters give him, and which results from his contract. But it is further to be considered, that the stipulation in question is introduced for the benefit of the underwriters, and to restrain the right of the assured to abandon upon the first notice of a hostile detention, by embargo or otherwise, which may be only temporary, and from which no serious consequences may result. It requires the assured to wait till it shall satisfactorily appear, by a detention of considerable length, that the enterprise is likely to be destroyed. But if such detention does not continue, the right to abandon is taken away, the underwriters are saved from their liability for a total loss, and the stipulation operates in fact to their benefit.
But where the detention does continue for the stipulated time, and the temporary detention assumes the aspect of hostile capture, by mutual agreement the right of abandonment takes effect, and when made it is to have the same effect as if made in the ordinary way where there is no such stipulation. *376 There must he a good subsisting and continuing cause ; die abandonment relates to that cause ; and when the right is establi'shed and exercised, it connects the abandonment with the cause of loss, and transfers the property to the underwriters as and from that time. It is the same thing in effect as if the detention or other cause of abandonment had happened in á remote part of the world, so that an unusual time had elapsed after the happening of the event, and before notice of abandonment could be given. But if notice be given seasonably after the information is received, the intermediate lapse of time makes no difference as to the effect of the abandonment in terminating the risk, ending the adventure of the assured, and transferring the property with all its incidents to the underwriters.

Exceptions overruled and judgment according to the assessor’s report.

 See Naylor v. Naylor, 9 Barn. & Cressw. 718 ; Harrat v. Wise, ibid. 712 Dagleish v. Hodgson, 7 Bingh. 495 ; Sperry v. Delaware Ins. Co. 2 Wash. C C. R. 243.