HUMPHREYS (DWIGHT v.). See Case No. 4,216.

HUMPHREYS (GLENN v.). See Case No. 5,480.

———

## Case No. 6,871.

### HUMPHREYS v. UNION INS. CO.

[3 Mason, 429.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1824.

MARINE INSURANCE—ABANDONMENT—AMOUNT OF RECOVERY—CONTRIBUTORY VALUE OF CARGO —COST OF REPAIRS—AVERAGE.

1. A vessel was insured from Messina to Boston. She met with disasters in the course of her voyage, put into Lisbon for repairs, and they were made, exceeding half her value. A bottomry bond was given for the amount. She proceeded on her voyage and safely arrived. Four days before her arrival, the owner abandoned, not having previous information. Subsequently, the vessel was sold under the bottomry bond. Held, that the loss was not total at the time of the abandonment, and the plaintiff could not recover for a total loss.

2. In this case, the underwriter was entitled to have the usual deduction on the repairs of one third new for old, as the sale of the vessel was by the default of the owner.
[Cited in Newlin v. Insurance Co., 20 Pa. St. 316.]

3. The contributory value of freight to a general average, is ascertained by a deduction of one third of the gross freight.

4. The actual cost of the repairs at its true value. and not the cost estimated at so much per milrea in a depreciated currency, is the rule, by which the underwriter is to pay for the repairs.

5. In an insurance on "cargo," composed principally of lemons and oranges, if the whole of the oranges are lost in the voyage by perils insured against, and the lemons are saved and arrive, the underwriter is not liable for the loss of the oranges under the usual memorandum, which warrants the underwriter free from particular average on "fruit." &c.
[Cited in Mutual Safety Ins. Co. v. Cargo of The George, Case No. 9,982; Pearse v. Quebec S. S. Co., 24 Fed. 287.]
[Cited in Dickey v. American Ins. Co., 3 Wend. 658; Wallerstein v. Columbian Ins. Co., 44 N. Y. 213; Silloway v. Neptune Ins. Co., 12 Gray, 87; Pierce v. Columbian Ins. Co., 14 Allen, 322; Mansur v. New England Mut. Mar. Ins. Co., 12 Gray, 521.]

———

[1] [Reported by William P. Mason, Esq.]

This was a suit on a policy of insurance of $2000 on the schooner Zephyr and appurtenances, and $1500 on her cargo, at and from Messina to Boston, with liberty to touch at Gibraltar. The loss stated was a total loss by the perils of the seas. Upon a summary hearing of the facts, at the last term, the court intimated an opinion, that the plaintiff was not entitled to recover for a total loss, and the cause was, thereupon, by consent, referred to auditors to report and state the loss, with liberty for the plaintiff to argue the case upon the questions of law upon the coming in of the report. The schooner duly sailed on the voyage from Messina for Boston, and having met with severe injuries from the perils of the sea, was obliged to put into Lisbon for repairs; and was there repaired at an expense exceeding half her value; to pay which the master, having no other funds, was obliged to give a bottomry bond on ship, cargo, and freight. After being repaired, that portion of her cargo (which was principally fruit) which remained undamaged was taken again on board, together with some additional cargo, and the schooner sailed for and safely arrived at Boston. Proceedings were there had against her upon the bottomry bond, under which she was sold, and the proceeds applied to the payment thereof. The abandonment was actually made about four days before the arrival of the schooner at Boston; the plaintiff, who was owner, not having previously had knowledge of the loss, so as to make an abandonment. The policy contained the usual memorandum against losses on perishable articles.

In respect to the loss upon the cargo, the following statement was contained in the report of the auditors: "In regard to the loss upon the fruit, it appears from the captain's protest at Lisbon, and from his testimony given before the commissioners, that he sailed from Messina on the 20th February, 1822. for Boston, with a cargo consisting of six bales of lamb skins, five or six cases of manna, three or four cases of essences of bergamot, two cases of hats, ten tons of brimstone, eleven hundred boxes of lemons, and two hundred and ninety nine boxes of oranges. The brimstone was stowed in bulk at the bottom of the vessel. The depth of the brimstone was about ten inches. A flooring was placed upon the brimstone, upon which flooring the fruit was stowed under and forward of the hatches, and filled the hold quite up to the deck amidships. Nothing extraordinary happened until the 1st of April. On that day a gale commenced, which continued several days; on the next day, April 2d, the Zephyr, being then in lat. 41° 50" north. longitude west. at 1 o'clock p. m., and lying to, was struck by a heavy sea and capsized; her masts and yards being under water, so that it came down below, the whole bigness of the gang-

way.' She soon, however, began to right a little, while it was with the utmost difficulty any of the crew could get on deck. But the master and some of the crew having got on deck, and succeeded in getting the helm up, the vessel righted; but having five ringbolts drawn out of her deck with other damage. The vessel lay in the trough of the sea, where the sea washed over her; and, to prevent her foundering, the mainmast was cut away. At about 2 o'clock the same day, the vessel then scudding and the gale still continuing, she took a heavy sea over the stern, which swept away every thing remaining upon deck. The holes made in the deck by the ringbolts being drawn were stopped up as soon as possible in the course of the afternoon, but not until towards night. The gale continued, and the weather was rough during the three or four following days. The vessel worked and strained a good deal during the time, and opened her seams and waterways more or less. When the vessel was capsized, the cargo was shifted so as to make the vessel incline about two streaks to the starboard. At the time of the vessel's capsizing, the captain thinks the water in the hold must have washed quite up to the deck on the side upon which the vessel was thrown. The vessel was found to make water after the time of being capsized, which the captain attributes partly to the holes of the ringbolts in the deck, and partly to the vessel's rolling and straining, and also to her receiving considerable water through the seams of the deck, when she lay upon her side. But he thinks the water did not accumulate in the hold to a depth exceeding that of the brimstone, and that none of the boxes of fruit were at any time immersed in water. On the 19th of April, seventeen days after being upset, the hold was opened and the cargo shifted in part, to bring the vessel on an even keel. The protest says, 'they found the cargo much wet under where the ringbolts were hauled out of the deck, and also much jammed and broken.' He testifies, that the brimstone was found to be washed quite up to the deck fore and aft, and that the boxes of fruit were wet on both sides, but most on the starboard side. The vessel arrived at Lisbon on the 26th of April, being twenty four days after upsetting; she remained at quarantine twelve days, until the 7th of May, when pratique was obtained, and the cargo allowed to be discharged. The boxes of oranges were discharged and put into the government stores. The lemons were examined and repacked, and out of 1100 boxes, 806 were repacked as sound. The oranges and lemons had been stored promiscuously. The captain thinks the boxes of oranges were more wet than those of the lemons. He is confident three quarters of the boxes of oranges had been wet; and says, those which had been wet were more decayed than those that

had not been wet. Those in boxes, which had been wet, he says were all decayed; but on the first examination at the expiration of the quarantine, the boxes that had not been wet contained some sound oranges. He thinks as many as twenty of the boxes did not at that time contain any sound oranges. Of the other boxes, some contained a few sound oranges, say five or six, and others only pieces. In the boxes least damaged, he says, not one tenth part of the oranges were sound. On the second examination, about two months subsequent to the first, all the oranges were found entirely decayed and rotten. A survey was had upon the cargo, at the request of the captain, by two English fruit merchants, and the American vice consul, who recommended selling the oranges. But he understood, that they would not be allowed to be sold, at least for any purpose except for exportation, and is not certain that they could have been sold for this purpose. But he thought it not advisable to take the oranges from the public stores, as the fees, for which he would have been liable in that case, would have exceeded their value."

Upon the report of the auditors, Mr. Peabody, for plaintiff, made several points. 1. That the plaintiff was entitled to recover for a total loss of the vessel, notwithstanding the abandonment was made, while she was in good safety on her voyage. She was never returned free to the owner, being then under the lien of the bottomry bond, upon proceedings to enforce which she was subsequently sold; so that the loss, which was originally total by injuries exceeding half her value, always remained total as to the owner. For this, he cited [Moreau v. United States Ins. Co.] 1 Wheat. [14 U. S.] 219; [Biays v. Chesapeake Ins. Co.] 7 Cranch [11 U. S.] 415; [Marcardier v. Chesapeake Ins. Co.] 8 Cranch [12 U. S.] 47; 3 Bos. & P. 477; 15 East, 566; 2 Term R. 407; 4 Maule & S. 575. 2. That the auditors were wrong in this case, supposing the loss on the schooner to be only a partial loss, in making a deduction of the one third new for old from the cost of the repairs, she never having been restored to the owner, so that he derived no benefit therefrom. Da Costa v. Newnham, 2 Term R. 407. 3. That the auditors in their report had estimated the milrea in the account of the repairs at 96 cents only (that being the true value paid,) whereas it ought to be estimated at 125 cents, that being the value in the currency of the country. 4. That in the general average the auditors ought not to have ascertained the contributory value of the freight by deducting one third of the gross amount; but they ought to have taken the true amount of the wages then due from the gross amount, and nothing more. 5. As to the cargo, that the plaintiff was entitled to recover for a total loss of the oranges, since

all the boxes were lost, notwithstanding the memorandum in the policy. That the memorandum applied only, where part of the cargo was composed of perishable articles; that where the whole of any one memorandum article was lost, the assured might recover for that, notwithstanding the rest of the cargo was safe. 3 Bos. & P. 474; 15 East, 559.

Mr. Webster, for defendants, contended contra. 1. That the plaintiff was not entitled to recover for a total loss. The loss was not total at the time of the abandonment, which is required by our law to justify it. The existence of a bottomry bond was no cause of abandonment. It was a mere lien. The owner was never dispossessed of the vessel, and she was ultimately lost by his neglect to pay the debt for the repairs. 2. That the deduction of the one third new for old was properly made by the auditors. That the case was unlike that in 2 Term R. 407. There, the underwriters had ordered the repairs. Here, the vessel came to the possession of the owner; and he, and not the underwriters, was bound to pay the bottomry bond. 3. That the auditors had estimated the milrea at its true value and allowed the real cost of the repairs, and they were not bound to allow a nominal value in a depreciated currency. 4. That the deduction of one third of the gross freight, in cases of general average, was now settled by usage and not to be disturbed. That even if the deduction were made of the wages, the result, as the auditors stated it, would be less favourable to the owner. 4. That the point, as to the memorandum, was not maintainable, for the exception in the memorandum was not of oranges, but of fruit generally. The lemons were saved, so that the whole of the memorandum article was not lost. But the principle was wrong. The late English cases were not law on this subject. The insurance in this case was on cargo generally. To entitle the assured to recover, there must be a total loss of the memorandum articles. A partial loss of them was not sufficient. [Biays v. Chesapeake Ins. Co.] 7 Cranch [11 U. S.] 415; [Marcardier v. Chesapeake Ins. Co.] 8 Cranch [12 U. S.] 47.

STORY, Circuit Justice. The first question is, as to the right of the plaintiff to recover for a total loss of the vessel. She sustained an injury, the repairs of which cost more than half her value. A bottomry bond was executed to secure the payment of the amount of the repairs. She sailed on the voyage and safely arrived at Boston. The abandonment was made, while she was on the high seas in the prosecution of her voyage in good safety, a few days only before her arrival in port. She was subsequently proceeded against upon the bottomry bond, sold by a degree of court, and the proceeds applied to the payment of the bond. Under these circumstances the question arises, whether the abandonment was valid, so as to bind the underwriters. It has been settled in the courts of the United States, that an abandonment is not good, unless the loss is, in fact, total at the time of the abandonment. The state of the information, or the existence of a total loss at an antecedent period, if it has no longer a continuance, gives no title to abandon. And when once the right of abandonment is fixed and acted upon, no subsequent events, which change the total into a partial loss, have any effect to divest the antecedent right of the parties. Such are the principles decided by the court, whose judgment I am bound to follow; and, as far as I have knowledge, they have received the sanction of the state tribunals most conversant with subjects of this nature throughout the Union. Rhinelander v. Insurance Co. of Pennsylvania, 4 Cranch. [8 U. S.] 29; Marshall v. Delaware Ins. Co., Id. 402; 6 Mass. 479; 3 Bin. 287; 7 Johns. 412; Peele v. Merchants' Ins. Co. [Case No. 10,905].

Applying this doctrine to the present case, how can it be said, that at the time of the abandonment there was a total loss? The vessel was physically safe, and in good repair. The voyage was not lost, for it was then in a successful progress, and was afterwards accomplished without further loss. It is true, that the vessel has been injured more than half her value; and if the owner had then elected to abandon without repairing her, he would have been justified by the established law on this subject. But the owner is in no case bound to abandon. He is entitled to repair the injury, however great, at the expense of the underwriter, and proceed in the voyage. In the present case, he elected through his agent, the master, to make the necessary repairs and continue the voyage; and for this purpose, the hypothecation of the vessel became necessary. The underwriters do not object to pay these expenses; but the attempt is made after the adventure is again put successfully in motion to compel them to pay a total loss. If there had been no bottomry bond given for the repairs, there would be no pretence to say, that the loss was total. But it is said, that the bottomry bond constituted a lien, which encumbered the vessel in her whole progress, and that she never came free to the possession of the plaintiff. The existence of such a lien is not per se a cause of abandonment. The vessel is not either technically or physically lost by it. It constituted during the voyage a contingent right. If the vessel had been subsequently lost in the voyage, all right under it would have been gone from the bottomry holder. But nevertheless the plaintiff would have been entitled to recover for a total loss from the underwriters. In the present case, the bottomry bond was not at the time of the abandonment a fixed and absolute lien; and the proceedings, under which the vessel

was sold, were long after the abandonment. A subsequent total loss will not aid an abandonment, bad at the time and ineffectual. In point of fact, however, the subsequent loss of the vessel was not occasioned by any peril insured against. "Causa proxima, non remota, spectatur." The ultimate loss was by the act of the owner himself, in not paying the bond after the successful termination of the voyage. If there was any default, it was his; and he ought consequently to sustain the loss. The case of Da Costa v. Newnham, 2 Term R. 407, is distinguishable. There, the repairs had been made by the express order of the underwriters, who afterwards refused to pay the bottomry bond given for expenses, and the vessel was sold upon proceedings under the bond occasioned solely by this default of the underwriters. No abandonment was ever made in that case; and the question was, notwithstanding, whether the owner was not entitled to recover for a total loss. At the trial, Mr. Justice Buller held, that he was. He said: "The bottomry bond was only £600, but the ship never came free into the plaintiff's hands; for in consequence of the refusal of the underwriters to discharge it, she was obliged to be sold. As for all the subsequent injury, which had accrued to the plaintiff in consequence of that refusal, and by which the plaintiff was damnified to the whole amount of the insurance, the underwriters were liable, because it was their own fault in not taking up the bond for the expenses of those repairs, which had been incurred by their own express directions." The court affirmed his opinion. In the present case there are no correspondent circumstances. The underwriters never advised the repairs, and never refused to pay for them. In 2 Term R. 407, the existence of the bottomry bond was not deemed a continuance of the total loss. But the subsequent loss was attributed to the express default of the underwriters. The case of McIver v. Henderson, 4 Maule & S. 576, does not apply. Independently of all other circumstances, there the voyage was lost. My opinion on this point is, that in no legal sense was the loss total at the time of the abandonment, and therefore the plaintiff is not entitled to recover for more than the partial loss.

The next point is, as to the deduction of the one third new for old from the repairs. The case of Da Costa v. Newnham, 2 Term R. 407, as to this point need not be disputed. There the court said, that the ground, why the deduction of one third new for old was ordinarily made, was because the owner had the possession of the vessel, and she was so far made better by the repairs. But in that case, by the default of the underwriters, the owner never had possession again of the vessel; and therefore the court very properly held, that he ought not to pay for a benefit, which he had never received. But in the present case, the loss has been voluntary on the part of the owner by his own default. He was never dispossessed of his vessel but under a decree, which he suffered, because he did not choose to pay the ship's debt contracted for his benefit and by the order of his own agent. The underwriters are therefore entitled to the deduction, because they have done no act to prevent the fullest possession by the owner.

As to the third point, the question is, whether the underwriters are to pay the actual expense at its true and real amount, or an increased amount by calculating it at a nominal value in a depreciated currency. The real sum paid by the owner was in milreas calculated at 96 cents, and he now attempts to get, not what he has paid, but an increased sum, such as the milrea would amount to, calculated in a depreciated currency at 125 cents per milrea. It is sufficient to say, that the underwriter is to pay the real, and not the imaginary expenses.

As to the fourth point, the practice in this state has long been in cases of general average to ascertain the contributory value of the freight by deducting one third of the gross amount. The rule was doubtless originally arbitrary, but founded upon a general average estimate of the usual deductions of wages and expenses from the freight in ordinary voyages. The object was to relieve each particular case from the embarrassment of nice calculations and questions about small items, which could not always be fixed by evidence absolutely exact. It has the benefit of certainty and universality in its application; and this consideration outweighs any slight deviation from principle, which possibly may be involved in it. It as often works in favour of one party as the other. If such a practice, existing for a long time by the acquiescence of the commercial community, were now for the first time in question, I should not hesitate to adopt it as reasonable. But it has been long acted upon by the profession, and has received general sanction in our courts. It cannot now be departed from without removing landmarks. See Phil. Ins. 363. The auditors, in their report state: "The nett freight brought into contribution is, according to usage, two thirds of the freight, (viz. $745). The assured proposes to determine the amount of the contributory interest of freight by deducting from the gross freight, i. e. $1117.50, the whole amount of the wages actually paid, viz. $546.58, leaving the contributory value of freight to be $570.92. But as wages are allowed in general average from the time of turning off for Lisbon to the time of sailing from that port (4 Mass. 548; Phil. Ins. 348; 14 Mass. 74), if the wages for this time be deducted, the remainder of wages will be less than one third of the gross freight." The rule, therefore, adopted by the auditors is, in this particular case, the most favourable for the assured. But I confirm it, as standing upon a reasonable and settled usage.

The fifth and last point is, whether the plaintiff is entitled to recover for a total loss of the oranges. The argument is, that the memorandum is not designed to exclude losses, where there is a total destruction of any specific, separated portion, as a box, hogshead, or bale of the memorandum articles; and a fortiori not, where there is a total destruction of the whole of any single memorandum article. The present insurance is upon cargo generally, and the memorandum in express terms exempts the underwriter from particular averages or partial losses on "salt, fish, fruit, grain," &c. &c. The memorandum does not designate oranges particularly by name, but they are comprehended, merely because they fall under the general description of "fruit." In the present case there were 1100 boxes of lemons, and 299 boxes of oranges on board. Of the lemons 806 boxes were saved; and supposing there was, upon the facts stated by the auditors, a total loss of the oranges, still there is no pretence to say, that the whole of the memorandum article "fruit" was lost. The argument, therefore, if it is to stand at all, must stand upon the ground, that the loss of the whole of any one article falling under the description of "fruit" in the memorandum, is a loss, for which the underwriters are liable. It is not distinguishable in principle from the case of the loss of a whole hogshead of sugar in policies, where sugar is warranted free from particular average. The case of Dyson v. Rowcroft, 3 Bos. & P. 474, seems to me to be perfectly correct in principle, but it turned altogether upon different principles. The insurance was on fruit, and in the course of the voyage the fruit was so much damaged by the perils of the seas, that it was rotten, and was necessarily thrown overboard at an intermediate port, into which the ship was driven. The loss was completely total by the destruction of the fruit, before it arrived at the port of destination. That case applies to the present, no farther than it has a tendency to prove, that there was in contemplation of law a total loss of the oranges by the events of the voyage. That point has not been much contested at the argument, and may be passed over without farther observation. The case of Davy v. Milford, 15 East, 559, is however a very strong authority for the plaintiff. There, the policy was on "flax," valued at £400, and warranted free from particular average. The ship was wrecked in the voyage. Part of the packages of flax was wholly lost, and part of them was saved in a damaged state. The court held the plaintiff entitled to recover for the packages entirely lost, but not for those, of which there was a partial loss or damage. It was admitted by the court, that the point was new, and finding no authority against it, they construed the policy divise; as to the damaged part within the warranty; as to that, which was totally lost, not. Upon this case, I confess myself to

have great difficulties. No reasons are assigned by the court for the determination, and as at present advised, I think the rationale to be the other way. What is this but a determination, that the loss of the whole or any portion of the thing insured, capable of a distinct enumeration, and separated from the rest, is out of the warranty? Suppose the insurance had been on coffee, or corn, what difference is there between the loss of a single kernel and a bag? between the loss of part of an aggregate made up of artificial and separate parcels, and of an aggregate made of things, in their own nature single and separate? The loss of the whole of a bag of coffee or corn does not seem to me to differ in principle from the loss of an equal quantity of coffee or corn in bulk. The true meaning of the memorandum has hitherto been supposed to be, that it shall exempt the underwriter from all partial losses or particular averages of the thing insured. What difference is there in principle or reason between a partial loss or average by the damage of a part, and a partial loss by the destruction of an integral part of the thing insured? To ascertain what the loss is, it must be estimated with reference to the whole. The insurance is not on each separate parcel or part of the thing insured, as an integral subject, but on the whole as an aggregate. The insurance in Davy v. Milford was not on each parcel of flax separately, but on the aggregate, as a totality. The memorandum warrants the underwriter free of particular average on the thing insured. It binds him only to a total loss of the thing insured. It seems to me, that the error of the reasoning is in considering the insurance as a separate insurance on each distinct parcel, and not as an insurance on the aggregate. This is a departure from the words of the policy. The court, in Thompson v. Royal Exchange Assur. Co., 16 East, 214, and Hedburg v. Pearson, 7 Taunt. 154, 2 Marsh. 432, refused to apply the same rule, where sugars were insured, and a part of the contents of each of the hogsheads was lost by sea damage. In the former case the policy was on "goods" (tobacco and sugar) generally, in the latter "on hogsheads of sugar." In each case the sugar was not merely damaged, but a part of the contents was wholly gone and destroyed. The distinction is certainly nice between the loss of a whole hogshead and the loss of the whole of a part of several hogsheads. If it had been the case of tobacco or rice or coffee, where the whole might have been saved, but in a damaged state, the ground of distinction would be more obvious. But when the very substance is gone, what difference can it make, whether it is the whole of one parcel, or a part of many parcels? See, also, Anderson v. Royal Exch. Ins. Co., 7 East, 38, and Glennie v. London Assur. Co., 2 Maule & S. 371. If, therefore, I were called upon to decide this question de novo, my judgment would re-

luctantly acquiesce in, if it did not lead me to dissent from, the opinion in Davy v. Milford. But the question has been definitively settled against the distinction in Davy v. Milford, by the supreme court of the United States, in Biays v. Chesapeake Ins. Co., 7 Cranch [11 U. S.] 415, and Moreau v. United States Ins. Co., 1 Wheat. [14 U. S.] 219. See, also, Guerlain v. Columbian Ins. Co., 7 Johns. 527; 1 Emerig. Ins. c. 12, § 45; [Marcardier v. Chesapeake Ins. Co.] 8 Cranch [12 U. S.] 39. These decisions are imperative upon me, and coincide with what I cannot but consider as the true and rational exposition of the memorandum. The report of the auditors is therefore confirmed. Decree accordingly.