DANIEL SILLOWAY & others *vs.* NEPTUNE INSURANCE COMPANY.

The condition of a vessel, falling within the warranty of seaworthiness, need not be represented to an underwriter at the time of obtaining insurance thereon, except in answer to inquiries; and the burden of proving misrepresentation in answer to such inquiries is upon the underwriter.

*It seems,* that it is not a deviation, for a vessel driven into a port by stress of weather, to proceed in good faith for repairs to a neighboring port where her owners reside, although she might have been repaired at the first port.

After underwriters have paid a partial loss as adjusted by their agent with knowledge of a previous deviation, they are estopped to set up that deviation as a defence to a claim for a subsequent total loss.

It is sufficient evidence of an abandonment, that the assured, within ten days after receiving news of a loss of a vessel, went to the underwriter's office, and asked for the papers of the vessel (which included the survey on which she had been condemned and sold), and, on the president of the office saying that the adjuster had them and had not made up the loss, said there was nothing to make up, as he claimed a total loss.

A policy of insurance on a vessel and cargo " at and from " a certain port is not, by reason of such description, avoided by the cargo having been laden at a previous port.

Under the provision in the memorandum clause in a policy of insurance, that the insurers shall not be liable "for any partial loss on salt, grain, fish, fruit, hides, skins or other goods that are esteemed perishable in their own nature, unless it amount to seven per cent. on the whole aggregate value of such articles and happen by stranding," the underwriters are liable as for a total loss on any one kind of these articles, which in consequence of perils insured against is of no value at the time of its arrival at the port of destination and is thrown away, although other kinds are only partially injured before arrival.

Underwriters are not liable for a constructive total loss of goods, not included in the memorandum clause, consigned to the port of destination for sale, and actually delivered to the consignees and sold there.

Under a policy of insurance to the charterers of a vessel " for whom it concerns," " on freight on board," the charterers may recover the amount of the money payable under the charter party at the termination of the round voyage, and which they have agreed to get insured; although the vessel is totally lost at the outward port.

ACTION OF CONTRACT upon a policy of insurance, dated March 6th 1852, insuring " Daniel Silloway & Co. for whom it concerns, payable to D. S. & Co.," $2500 on one half of the schooner Atlantic, $2300 on one half of her cargo, and $350 on one half of " the freight on board said schooner," at and from Portsmouth, N. H., to Guayama, Porto Rico, and thence to port of discharge in the United States." The schooner was valued in the policy at $5000. The other subjects of insurance were

not valued.   The policy was in the common Boston form ; and provided that the insurers should not be liable " for any partial loss on salt, grain, fish, fruit, hides, skins, or other goods that are esteemed perishable in their own nature, unless it amount to seven per cent. on the whole aggregate value of such articles and happen by stranding." Trial at November term 1854, before *Metcalf*, J., who reported to the full court the following case :

The plaintiffs were permitted, against the defendants' objection, to introduce in evidence a charter party of the vessel to them from David S. Poor, the owner, on and from the 2d of February 1852 for a voyage from Newburyport to Guayama and thence to a port of discharge in the United States, by which they agreed to pay to Poor " seven hundred dollars for the voyage, and all foreign and domestic port charges, all pilotages and lighterages, and insure the vessel and the charter during the voyage aforesaid, the vessel valued at five thousand dollars and the charter at seven hundred dollars as aforesaid, and in case of loss of vessel and freight, to pay the party of the first part fifty-seven hundred dollars ; the amount of charter to be paid at the termination of the voyage aforesaid."

The vessel was laden in February 1852 at Newburyport, where the owners resided, with a cargo of codfish and mackerel (which constituted two thirds in value of the memorandum articles), fruit, vegetables, pork, crackers, cheese, chairs, nails and lumber, consigned for sale to a mercantile house at Guayama. She met with an accident in loading at Newburyport, and was despatched thence to Portsmouth, for the purpose of being drawn up on the marine railway there and repaired.   She leaked badly on the passage, and arrived at Portsmouth on the 26th of February, was taken on the railway with all her cargo on board, and to some extent repaired.   There was much conflicting evidence as to her condition at this time.   The shipwrights who made the repairs testified that a small portion only of her sheathing was taken off; that her butts and seams were found very open ; and that in their opinion, in order to make her seaworthy, her whole sheathing should have been removed and all her butts

and seams tried and recaulked; that they so informed Currier, one of the plaintiffs, who superintended the repairs, but he refused to have it done and caused the portions already opened to be caulked and the sheathing restored. But this evidence was contradicted by witnesses who examined her at Newburyport ten days afterwards, and by her officers and some of her crew, who testified that she was seaworthy when she left Portsmouth. This question was submitted to the jury, who returned a verdict for the plaintiffs.

The vessel sailed from Portsmouth for Guayama on the morning of the 5th of March. The next day Currier applied to the defendants for a policy upon her. The defendants' president upon this point testified as follows : " I am not in the habit of writing, particularly West India risks, for people that I am not acquainted with; and that made me more particular to inquire of Mr. Currier the situation of this vessel. With regard to the valuation I inquired particularly, and he answered that he had been offered at that rate by a master for a part of her; I remarked that the vessel ought to be a very good one to be worth so much, and he said she was a stanch, good vessel. Mr. Currier told me her age; I think seven or eight years. He gave no intimation that she had been sent from Newburyport leaky, or for repairs; he neither said to me, nor did I know, that she had been sent to Portsmouth, or had leaked at Newburyport. I supposed she had been loaded at Portsmouth; did not know she had leaked, nor that she had been on the railway. A disclosure of the leak at Newburyport and of the vessel's having been put on the railway to repair would affect the risk materially in my judgment. I should not have taken the risk, if I had known these facts."

The vessel about nine o'clock in the evening after her departure from Portsmouth encountered strong gales with a dense fog and heavy sea; about midnight she sprung a leak, and half an hour afterwards the master tacked ship, and put into Gloucester in distress, arriving there early the next morning. The master went to Newburyport for orders, and by direction of the owners returned to Gloucester, and sailed on the 7th for Newburyport,

arrived there on the 8th, and received some damage in coming to the wharf. A claim was made on the defendants for this loss, which was adjusted by an agent sent by the defendants to Newburyport to investigate the matter, and the amount paid by the defendants ; and by indorsement on the policy, " liberty is given for the schooner Atlantic to make her present voyage on a single bottom." The defendants introduced evidence, which was not contradicted, that the vessel could have been repaired at Gloucester as well as at Newburyport.

On the 1st of April, after the vessel had been repaired and her cargo reladen, she again sailed on her voyage. She encountered severe gales, and arrived at Guayama' on the 24th of April, much damaged. The cargo, excepting a part of the deck load, which had been lost overboard, was delivered to the consignees; and both the vessel and the cargo, after being surveyed, were sold at auction. The vessel could not have been repaired at Guayama. Merchants who saw the cargo there testified that it appeared to have been wet with salt water and was in bad order ; that the fruit and vegetables were decayed and spoiled and thrown into the sea; and that the fish and other articles were much damaged, some more and some less, and were sold at much less than cost.

The plaintiffs relied upon the following conversation as evidence of an abandonment and claim for a total loss : In June 1852, within a week or ten days after receiving news of the loss, one of the plaintiffs went into the defendants' office, and inquired for the papers of the schooner Atlantic. The president said that the adjuster had them, and had not made up the loss. The plaintiff said there was nothing to make up, as he claimed a total loss, and he wanted the papers. The president did not deny that the plaintiffs had abandoned as for a total loss. The plaintiff went away without the papers. The defendants in August 1852 sent an adjustment, together with the survey and other papers, to the plaintiffs, who refused to accept the defendants' adjustment and returned it to them, saying, " We shall make up our claim on the office agreeably to the notice of the abandonment and papers left at your office June 9th 1852."

The defendants stated the following points of defence, which were reserved for the determination of the whole court :

1st. " That there was a misrepresentation and concealment of facts, material to the contract and risk, by the assured at the time of effecting the insurance, which avoided such insurance."

2d " That the removal of the schooner from Gloucester to Newburyport was a deviation which discharged the underwriters."

3d. " That the policy did not attach to this cargo, as it had been laden on board the vessel at a previous port ; and especially as that fact was not disclosed to the underwriters at the time when the insurance was effected, and the vessel leaked on her voyage from such previous port."

4th. " That a claim for a total loss, made some time after the papers were placed in the defendants' hands, by the assured saying to the underwriters that there was no occasion for an adjustment, because the assured claimed a total loss, was no abandonment."

5th. " That as to such portion of the cargo as was included in the common memorandum respecting perishable articles free of particular average, there could be no claim for a loss of them, as they reached their port of destination, even if valueless, a fact which was denied on the evidence."

6th. " That there could be no constructive total loss of cargo which arrived (as in this case) at its port of destination, by proof of damage exceeding fifty per cent.," and " that if there could be such a constructive total loss, yet on cargo of a mixed character, no abandonment for mere deterioration in value during the voyage could be valid, unless the damage on the non-memorandum articles exceeded a moiety in value of the whole cargo, including the memorandum articles."

7th. " That the policy was on ' freight on board said schooner,' and therefore limited to the freight of the cargo which actually was laden on board the vessel at the time, and which the defendants averred was duly delivered or reached its destination."

It was agreed that the whole court might draw such inferences

as a jury would be warranted in drawing, or submit the case to a jury upon any point, if they should see fit; and that the verdict, if sustained at all, should be reformed, if necessary, by an assessor, upon principles to be settled by the court.

This case was argued at November term 1856.

*E. Merwin,* for the plaintiffs, besides some of the authorities referred to in the opinion, cited, to the point that the assured need not disclose any facts, however material to the risk, as to the unseaworthiness of the vessel, covered by the warranty of seaworthiness, 1 Arnould on Ins. §§ 205–213 ; *Shoolbred* v. *Nutt,* 1 Marsh. Ins. 474 ; *Hayward* v. *Rodgers,* 4 East, 596, 597 ; *Walden* v. *New York Firemen Ins. Co.* 12 Johns. 128 ; *De Wolf* v. *New York Firemen Ins. Co.* 20 Johns. 229, and 2 Cow. 56 ; that the removal from Gloucester to Newburyport was not a deviation, 1 Phil. Ins. §§ 1019–1022 ; *Turner* v. *Protection Ins. Co.* 25 Maine, 515 ; that the abandonment was sufficient, 2 Arnould on Ins. § 403 ; 2 Phil. Ins. §§ 1678, 1682 ; *Peirce* v. *Ocean Ins. Co.* 18 Pick. 93 ; *Read* v. *Bonham,* 3 Brod. & Bing. 147 ; *Patapsco Ins. Co.* v. *Southgate,* 5 Pet. 604 ; *Cassedy* v. *Louisiana State Ins. Co.* 18 Mart. 421 ; that the words " at and from " a port did not imply that that was the port of loading, *Fort* v. *Lee,* 3 Taunt. 381 ; that there was a total loss of the memorandum articles, *Williams* v. *Cole,* 16 Maine, 207 ; *Williams* v. *Kennebec Mutual Ins. Co.* 31 Maine, 455 ; *Hugg* v. *Augusta Ins. & Banking Co.* 7 How. 604–608 ; 2 Phil. Ins. §§ 1766, 1769, 1772 ; that the plaintiffs could abandon and claim for a total loss of the cargo not included in the memorandum clause, *Marcardier* v. *Chesapeake Ins. Co.* 8 Cranch, 39 ; 3 Kent Com. (6th ed.) 321 ; 2 Arnould on Ins. (Amer. ed.) § 376, & note ; 2 Phil. Ins. §§ 1608, 1611, 1612 ; *Seton* v. *Delaware Ins. Co.* 2 Wash. C. C. 179 ; *Forbes* v. *Manufacturers' Ins. Co.* 1 Gray, 371 ;. and that there was a total loss of freight, which the plaintiffs might recover for the benefit of the owner, *Oliver* v. *Greene,* 3 Mass. 133 ; *Coffin* v. *Storer,* 5 Mass. 252 ; *Bartlet* v. *Walter,* 13 Mass. 267 ; *Foster* v. *United States Ins. Co.* 11 Pick. 85 ; *Farrow* v. *Commonwealth Ins. Co.* 18 Pick. 53 ; *Rider* v. *Ocean Ins. Co.* 20 Pick. 265 ; *Robinson* v. *Manufacturers' Ins. Co.* 1 Met. 143 , 2 Phil. Ins. §§ 1958,

1965; 1 Arnould on Ins. § 113; 2 Arnould on Ins. § 373; Abbott on Shipping, (7th ed.) 462, 470 & note.

*S. Bartlett,* for the defendants.    1.  The defendants concede it to be well settled that the assured, in the first instance and without inquiry, is not bound to make disclosures in relation to matters which are the subject of express or implied warranty on his part under the policy; although the doctrine has been doubted. 2 Duer on Ins. 434 *& seq.*  But if these same matters are subjects of inquiry by the underwriter, the assured is bound to state the facts truly.   1 Phil. Ins. § 530.   1 Arnould on Ins. § 194. This policy was to cover the vessel from her arrival at Portsmouth; and the representation that she was a "stanch, good vessel" applied to the same period, and, being false, (for she was then injured and not repaired,) avoided the policy.   Withholding information of the opinion expressed by the shipwrights at Portsmouth is equally fatal, whether that opinion was or was not accurate and believed by the plaintiff.   *Kirby* v. *Smith,* 1 B. & Ald. 672.  2 Duer on Ins. 391–403.   1 Arnould on Ins. § 199.

2.  Going from Gloucester, where repairs could equally well have been made, to Newburyport, for the convenience of the owners, was a deviation.   The facts do not show that the defendants had any knowledge of this deviation in May, when they paid the partial loss and gave liberty to proceed with the voyage.   If they had, yet, having made no new contract, and received no new consideration, they should not be estopped to set up a previous breach of condition.

3.  The abandonment was not seasonable nor sufficient.

4.  The description of the voyage in the policy as "at and from Portsmouth, N. H., to Guayama, Porto Rico," is an implied representation that the cargo was laden at that port; and very material, as affording recent opportunity of knowing its condition.   *Payne* v. *Hutchinson,* 2 Taunt. 405, note.   *Constable* v. *Noble,* 2 Taunt. 403.   *Murray* v. *Columbian Ins. Co.* 4 Johns 443. 1 Arnould on Ins. § 207.   *Hodgson* v. *Richardson,* 1 W. Bl 463.

5.  There can be no claim for loss on the memorandum articles (codfish and mackerel) which arrived of value at their port of destination and were sold there.   *Morean* v. *United States*

*Ins. Co.* 1 Wheat. 219. *Hugg* v. *Augusta Ins. & Banking Co.* 7 How. 595. *Lord* v. *Neptune Ins. Co.* 10 Gray, 109. Nor even on the fruit and vegetables which arrived in a damaged and valueless state. 2 Arnould on Ins. § 372.

6. No claim for total loss of that part of the cargo not embraced in memorandum articles can be sustained, as it had arrived at its destination and the voyage had not been broken up. The same doctrine which is true as to a ship is true as to cargo. 2 Phil. Ins. § 1611. 2 Arnould on Ins. § 370.

Nearly three fourths of the invoice value of memorandum articles consisted of codfish and mackerel. They arrived, and, though damaged, were sold. Of course no claim for loss on these articles can be sustained. *Lord* v. *Neptune Ins. Co.* 10 Gray, 109. *Hugg* v. *Augusta Ins. & Banking Co.* 7 How. 595.

7. If recovery can be had for freight at all, it must be only for the difference between the freight insured on the outward voyage and the sum of $700. The interest covered by the policies was understood to be the mere charter money, payable by plaintiffs under the charter party, ($700,) which they agreed with Poor the owner to insure for that sum; and in case of loss, to pay him whether they recovered the insurance or not. This contract gave the plaintiffs an insurable interest to that extent, though it is quite doubtful if it could be covered by the term " freight." *Riley* v. *Delafield,* 7 Johns. 522. *Mellen* v. *National Ins. Co.* 1 Hall, 452. · If the amount to be paid by the charterers and the amount to be received by them were equal, they would clearly have had no insurable interest in freight. *Cheriot* v. *Barker,* 2 Johns. 346. *Clark* v. *Ocean Ins. Co.* 16 Pick. 289. If the charter party had not made it clear what the interest covered was, yet, upon a technical construction of the policy, the same results would apparently follow; for the freight is not valued, and the insurance is stated to be on "freight on board" said schooner. This restricts the right of recovery to the freight of the cargo thus laden; and inasmuch as the greater part of that cargo arrived and was delivered, and the freight on it was thus earned and paid, no recovery can be had except to the extent, if any, to which the freight received fell short of that agreed. *Adams* v. *Pennsylvania Ins. Co.* 1 Rawle, 97.

BIGELOW, J. The claim of the plaintiffs is founded on an alleged total loss of the vessel and of the cargo and freight covered by the policy declared on.

First, as to the vessel. The defendants do not deny that the facts proved at the trial are sufficient to show a total loss of the subject of insurance. They rest their defence to this part of the plaintiffs' claim on two other distinct grounds.

1. The first is that there was such misrepresentation and concealment of material facts concerning the condition and situation of the vessel at the time of effecting insurance as to avoid the policy. So far as this part of the defence is founded on a supposed suppression of facts, it is very clear that it cannot avail the defendants. The assured were not bound to make any statements whatever concerning the condition of the vessel. This was embraced by the warranty of seaworthiness. The doctrine is well settled and familiar, that the assured are not required to state any fact which is included in those matters concerning which the law implies an agreement or warranty.

As to the other branch of this ground of defence, we are not satisfied that any misrepresentation of the actual condition of the vessel was made by the assured. No doubt they were bound to answer all inquiries truly respecting the soundness of the vessel and her fitness to undertake a voyage, although these were embraced in the implied warranty of seaworthiness. The law, while it does not require the assured to make any statements or representations on such matters in the first instance, does exact that he shall answer all inquiries concerning them truly. On looking carefully at the evidence adduced at the trial, bearing on the question of the stanchness and soundness of the vessel at the time the policies were effected, we find it to be exceedingly conflicting and quite irreconcilable. But the burden of proof to establish the alleged misrepresentation is on the defendants. The jury have found that the vessel was seaworthy at the inception of the risk, which they could not have done if the witnesses who testified in behalf of the defendants concerning the condition of the vessel at Portsmouth when the policies attached were worthy of credit. In this state of the case, we cannot say

that the defendants have shown that the alleged representation by the assured that the vessel was stanch and strong was untrue.

2. The other ground of defence to the claim for a total loss of the vessel is that the underwriters were discharged from their liability under the policies by an alleged deviation of the vessel. The material facts bearing on this point are these: The vessel sailed from Portsmouth in the forenoon of the 5th of March, bound on a voyage to Guayama. On the evening of the same day she encountered strong gales and heavy seas. About midnight she sprung a leak, and thereupon the master tacked ship, and put into Gloucester in distress, arriving there early in the morning of the 6th of March. On receiving orders from the owners (who resided at Newburyport) and in compliance therewith, he sailed from Gloucester on the next day and arrived at Newburyport early in the afternoon of the day after, where the needful repairs in the vessel were made. It is the sailing from Gloucester to Newburyport under these circumstances, which constitutes the alleged deviation. We doubt very much whether these facts do constitute even a technical deviation sufficient to discharge the policy. The master was fully justified in seeking a port in consequence of sea damage, but he was not absolutely obliged to remain there and make the needful repairs. If, in the exercise of good judgment and sound discretion, and acting in good faith, he deemed it expedient for the interest of all concerned to go to an adjoining port, the home of the owners, where the vessel could be refitted with greater convenience and less expense, and without incurring any actual increase of risk, we are strongly inclined to the opinion that he might do so without discharging the underwriters on the ground of an unlawful or unjustifiable variance from the course of the voyage; and under similar circumstances that the owners might direct the master to take the vessel into her home port.

But however this may be, we are clearly of opinion that the defendants are estopped in the present case from alleging the supposed deviation as a ground of defence to this policy. It appears by the evidence, that the fact of her having put into

Gloucester before she went into Newburyport was fully known to the defendants' agent, who went to the latter place for the purpose of examining the vessel and adjusting the loss which had then happened; and that subsequently to this they not only paid the amount of the loss, but also gave liberty to the owners, by an indorsement in writing on the policy, to proceed to sea with the vessel on a single bottom. The defendants thus recognized the validity of the policy as a subsisting contract, with a full knowledge of the alleged deviation, and they allowed the plaintiffs to send the vessel to sea, not only without any suggestion that they had forfeited their right to hold the insurers liable, but in the belief that she was covered by a policy the validity of which was not denied or doubted by the defendants by reason of any preëxisting fact. The plaintiffs, under these circum stances, had a right to regard any objection on the ground of the supposed technical deviation to have been waived. Certainly it cannot be allowed as a defence to this action, without operating as in the nature of ·a fraud on the plaintiffs, who have acted on the belief that the policy was in force during the prose cution of the residue of the voyage.

3. It was suggested that there was no sufficient evidence of abandonment. But it appears that the papers relating to the vessel, including the survey upon which she was condemned and sold at Guayama, were delivered to the underwriters within a few days after the news of the loss was received, and a total loss was then claimed by the plaintiffs. An abandonment need not be in writing. All that is needful is that a total loss by perils insured against should be distinctly indicated to the underwriters. *Thwing* v. *Washington Ins. Co.* 10 Gray, 451.

It follows that the defendants have failed to establish either of the points of defence on which they rely to the claim of the plaintiffs for total loss of the vessel.

4. We next come to a consideration of that part of the case which relates to an alleged loss of the cargo. It is first objected that no recovery can be had under the contract for any loss on this subject of insurance, because there was an implied representation or warranty that the cargo was taken on board at

Portsmouth; and that it having been in fact previously laden at Newburyport, there was such a breach of the warranty or misstatement as to avoid the policy on the cargo. This ground of defence is based on the words of the policy which describe the voyage assured as being " at and from Portsmouth;" and it is contended that these words, as applied to the cargo, import that it was laden at that port and does not cover goods or merchandise previously taken on board. But it seems to us that this position is wholly untenable. The voyage insured was accurately described. The cargo was at Portsmouth on board the vessel at the time the insurance was effected, and was then safe and a fit subject in all respects for insurance. The words of the policy imported nothing further. The authorities, on which the defendants rely in support of the position that the words of the policy import a representation or warranty as to the place of loading the cargo, do not sustain it. They are wholly unlike the case at bar. One class of them is where the policy contained an express stipulation that the risk was to begin on the taking in of cargo at a specified port. Within this class fall *Hodgson* v. *Richardson,* 1 W. Bl. 463, and 3 Bur. 1477; *Robertson* v. *French,* 4 East, 130; *Graves* v. *Marine Ins. Co.* 2 Caines, 339. Another more numerous class is where the voyage was described as at and from a designated place, but the cargo was never at the place named, but was taken in at some other town or city. Such was the point decided in *Payne* v. *Hutchinson,* 2 Taunt. 405, note; *Constable* v. *Noble,* 2 Taunt. 403; *Murray* v. *Columbian Ins. Co.* 4 Johns. 443. It is obvious that these cases have no resemblance to the present. In the policy declared on, there is no stipulation that the risk was to begin on taking in the cargo, nor were the goods laden on board subsequently to the departure of the vessel from the designated port. The cargo was in the vessel, and the risk commenced, at the place named in the policy.

5. The claim of the plaintiffs for a total loss of cargo may be properly considered under two separate and distinct heads. The first relates to the memorandum articles, fruit and vegetables, composing a part of the cargo, and which are excepted

from particular average unless it amounts to seven per cent. and happens by stranding. To this it is objected, in the first place, that the evidence does not show that any of them were so far destroyed on their arrival at the port of discharge as to come within the rule of law which authorizes the assured to recover for a total loss on such articles. But the testimony on this point shows that the fruit and vegetables were absolutely decayed and rotten on the arrival of the vessel, so that they were not only valueless, but had ceased to exist *in specie,* and had become a mere nuisance. Such being the fact, there can be no doubt that these articles were totally lost, within the meaning of the rule of law applicable to articles of a perishable nature and included in the memorandum clause. *Williams* v. *Cole,* 16 Maine, 207. *Hugg* v. *Augusta Ins. & Banking Co.* 7 How. 604–608. *Robinson* v. *Commonwealth Ins. Co.* 3 Sumner, 220. *Poole v. Protection Ins. Co.* 14 Conn. 52. 2 Phil. Ins. § 1767.

6. But it is further objected that the plaintiffs are not entitled to recover for the articles thus actually lost, because a portion of the cargo included within the memorandum clause was not totally destroyed, but arrived at the port of destination *in specie* and only partially injured. In other words, the position of the defendants is that the assured cannot recover for one species of memorandum articles, specifically named in the policy, which has been lost, if there are other articles of wholly different species, included in the memorandum, which have not been totally lost. But this is not a correct interpretation of the contract as applied to the subject matter. No doubt the rule would be as contended for, if the memorandum articles included in the cargo consisted of one species only, a part of which was lost. When an insurance is made free from average indiscriminately on an article, the assured cannot recover for a total loss on account of the destruction of a part of such article, although it may have been contained in different packages or bales. But the rule is otherwise when the articles embraced in the exception from partial loss are specifically named and are of different kinds or species. The true office of the memorandum is to exempt the underwriters from all partial losses of the thing insured. But when

the cargo consists of several distinct species or kinds of articles, all of which are embraced within the memorandum, each forms a separate thing or class, and the exception is to be applied to each separately, considered as an independent subject of insurance. The chief object of inserting an exception of certain kinds of merchandise from particular average is to exempt the insurer from liability for the partial decay or loss of parts of the cargo which have an inherent tendency to deteriorate and waste away, and in regard to which it is difficult to ascertain whether the injury to them has been caused by sea damage or by intrinsic defects. This object is fully attained by regarding such species of merchandise separately designated in the memorandum, as a distinct subject of insurance. To illustrate; if salt, grain, fish and fruit are specifically excepted from partial loss, the tendency to decay in any one of them has no natural or necessary connection with a similar tendency in the others. The same causes which might operate to injure one article might wholly destroy another and leave a third wholly unaffected. The language of the exception, as inserted in the policy, is founded on this view of the intention of the parties. It is that the insurers shall not be liable for any partial loss on salt, grain, fish, fruit, hides, skins *or* other goods that are esteemed perishable; that is, that the insurers shall not be liable for partial loss on salt or grain, or fish or fruit; clearly regarding each enumerated article as separate and distinct from all the others, and implying that the insurers shall be liable for a total loss on each. The construction of the policy is the same as if there were a special exception of each article by itself from partial loss, instead of grouping them together in one clause. This might not be the true interpretation if the exception were in general terms of all perishable goods; but it certainly is the only reasonable one where the articles are specifically named, as in the policy declared on. Such we understand to be the received rule in construing policies where different articles are at risk subject to the same exception. The exception is applied to each article separately. Thus, for example, if sugar and hides are excepted from all losses under a certain per cent. in adjusting a loss, if it

amounts on either to the specified percentage, the underwriters are liable. 2 Phil. Ins. § 1785. By parity of reasoning we do not see why, in construing the exception of certain articles from any claim for partial loss, each article enumerated is not to be regarded as the subject of a special exception, and if any one is totally lost why the insurers should not be held liable therefor. No case has been cited by the counsel for the defendants in support of an opposite doctrine. The adjudged cases seem to proceed on a view of the construction of the memorandum clause, similar to that which we have now stated. *Wadsworth* v. *Pacific Ins. Co.* 4 Wend. 40, 41. *Humphreys* v. *Union Ins. Co.* 3 Mason, 429. *Biays* v. *Chesapeake Ins. Co.* 7 Cranch, 415. *Louisville Marine & Fire Ins. Co.* v. *Boland,* 9 Dana, 156.

But it is urged that the memorandum clause in the policies declared on, which is the same, we believe, as is now inserted in all policies issued in Boston offices, differs in an essential particular from such clause as it is usually found in policies issued in New York and elsewhere, and that it is not susceptible of the construction for which the plaintiffs contend. This argument is founded on the language of the proviso excepting a liability from partial loss on the specified articles, " unless it amount to seven per cent. on the whole aggregate value of such articles and happen by stranding." It is contended that this clearly stipulates that the articles enumerated in the clause are to be regarded as an entirety. Certainly they are to be so regarded, when the claim is for a partial loss, in computing the seven per cent. Such was the manifest purpose of the proviso. But this was the sole purpose, and it is fully answered and accomplished by applying it in cases of adjustment of partial losses on the memorandum articles which happen by stranding. It defines and limits the insurer's liability in such cases. But it has no application to the case of a total loss of such articles. It does not follow, because the parties have stipulated for a certain mode of calculating a partial loss, that the same mode is to be adopted in ascertaining whether there has been a total loss. On the contrary, the implication is strongly the other way. The insertion of the proviso recognizes the existence of a rule that

the insurers would be liable for a partial loss on one or more different species of articles enumerated in the memorandum, if it amounted to the required per centage on each, although it might fall short of that amount, if calculated on the aggregate value of all the articles. The proviso was intended to prevent the operation of this rule in case of a partial loss. But a similar rule operated to make the insurer liable for the total loss of a separate species or kind of article enumerated in the memorandum, although others included in the same clause might escape damage or be only partially injured or lost. If the parties intended to avoid the operation of this rule, it is reasonable to suppose that they would have inserted an express stipulation applicable to cases of a total loss of memorandum articles at the time when they were modifying their contract in its application to partial losses on the same articles. It certainly seems to be a case where the maxim *expressio unius exclusio alterius* is quite decisive.

It results from this view of the principles of law applicable to this part of the case, that the plaintiffs are entitled to recover for a total loss of the fruit and vegetables which did not arrive *in specie* at the port of destination.

The claim of the plaintiffs for a constructive total loss of the articles not included in the memorandum cannot be supported. This part of the cargo arrived at its port of destination. The goods were shipped, as appears by the invoice, for Guayama, consigned for sale to a mercantile house there. There is nothing in the case to show that the voyage was intended to be a trading voyage to successive ports of destination for discharging the cargo and reinvesting the proceeds. It is the ordinary case of insurance on a cargo which arrived at its place of destination injured by perils of the sea. No constructive loss can exist where any considerable part of the goods, though less than half in value, is landed at the port for which they were shipped. 2 Phil. Ins. §§ 1611, 1612. *Forbes* v. *Manufacturers' Ins. Co.* 1 Gray, 371.

7. The only remaining question is as to the right of the plaintiffs to recover in this action for a total loss of freight. On this

point we can entertain no doubt. By the charter party under which the plaintiffs hired the vessel, it appears that they were to pay the owners for the round voyage to Guayama and back again to a port in the United States the sum of seven hundred dollars, and they also thereby stipulated to insure the freight for the said sum of seven hundred dollars. Under this provision it was the right and duty of the plaintiffs to procure insurance on the freight or charter money for the use and benefit of the owner. They were his agents to procure insurance on the freight, and can well maintain the action in their own names. 2 Phil. Ins. §§ 1958, 1965. *Munson* v. *New England Marine Ins. Co.* 4 Mass. 88. This was the clear intent of the parties. The plaintiffs had no insurable interest in their own right in the freight. As the vessel was lost by perils insured against during the performance of the voyage specified in the charter and before any freight was due, there was a total loss of this subject of insurance.

Unless the parties agree on the sum due under the policies, the case must be sent to an assessor to determine the amount according to the rules and principles hereinbefore stated.

*Judgment on the verdict.*